**OSAWA & COMPANY, Plaintiff,**

v.

**B & H PHOTO, Tri State Inc. and John Does 1–10 Defendants.**

**No. 83 Civ. 6874 (PNL).**

United States District Court,
S.D. New York.

May 24, 1984.

As Modified July 27, 1984.

---

Wallenstein, Wagner, Hattis, Strampel & Aubel, Robert E. Wagner, Linda A. Kuczma, Chicago, Ill., Pennie & Edmonds, John E. Kidd, Gideon D. Stern, Robert M. Kunstadt, New York City, Michael W. Havrilla, Chicago, Ill., for plaintiff.

Miller, Cassidy, Larroca & Lewin, Nathan Lewin, James L. Volling, Washington, D.C., Groman & Wolf, P.C., Marvin H. Wolf, Mineola, N.Y., for defendant B & H Photo.

Harvey M. Greene, New York City, for defendant Tri State Inc.

## OPINION AND ORDER

LEVAL, District Judge.

The owner of U.S. trademarks pertaining to goods of foreign manufacture seeks by this action to enjoin others from independently importing and dealing in goods of the same manufacture, bearing the same marks lawfully applied abroad by the foreign owner of the marks. The commerce against which this action is directed is colloquially named the "grey market".

Plaintiff Osawa & Company, a Delaware corporation, is the registered owner of United States trademark rights for the Mamiya marks,[1] which are used on high quality medium-format photographic equipment manufactured in Japan by the Mamiya Camera Co. ("Mamiya Co."). Mamiya Co. is the owner of the Mamiya marks in Japan, where it lawfully places those marks on the camera equipment it manufactures. J. Osawa & Co. Ltd., a Japanese entity ("Osawa-Japan"), is the exclusive worldwide distributor of Mamiya Co.'s products.

---

1. These include Mamiya, Mamiya RB 67, Mamiya-C and Mamiya-Sekor.

It has granted exclusive U.S. distribution rights to the plaintiff, to whom it sells. Osawa-Japan and Mamiya Co. own, respectively, 93% and 7% of plaintiff's stock. Osawa-Japan owns 30% of Mamiya Co.'s stock. Under the "Genuine Goods Exclusion Act," 19 U.S.C. § 1526, in May 1982 plaintiff, as the owner of the U.S. trademark rights, was granted by the U.S. Customs Service an order of exclusion barring the unauthorized importation of goods bearing the Mamiya marks.

The defendants B & H Photo and Tri State Inc. are New York discount camera dealers. They are alleged to have imported cameras and related equipment bearing the Mamiya marks to the United States without plaintiff's authorization and in violation of the Customs order of exclusion.

Plaintiff moves for a preliminary injunction barring the defendants from advertising and dealing in such Mamiya-marked equipment. Plaintiff alleges that its right to such an injunction is conferred by the Exclusion Act as well as § 42 of the Lanham Act, 15 U.S.C. § 1124, by §§ 32 and 43 of the Lanham Act, 15 U.S.C. §§ 1114, 1125, forbidding trademark infringement and unfair competition, and by state law principles of unfair competition and trademark dilution.

This is plaintiff's second effort to obtain an injunction against grey market importation and sale of Mamiya-marked products. On the first occasion, plaintiff, then using its predecessor name *Bell & Howell: Mamiya Co.* (reflecting that at the time it was 50%-owned by Bell & Howell Company), brought a similar action in the U.S. District Court for the Eastern District of New York against another dealer, Masel Supply Co. Judge Edward Neaher, finding trademark infringement and a substantial likelihood of confusion, granted a preliminary injunction. *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 548 F.Supp. 1063 (E.D.N.Y. 1982). The Court of Appeals ruled that plaintiff had not adduced sufficient evidence of likelihood of confusion to carry its burden of showing irreparable harm and vacated the injunction. *Bell & Howell:*

*Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42 (2 Cir.1983).

In the *Masel* action, plaintiff had proceeded on the theory that proof of infringement would entitle it to injunctive relief and therefore offered no substantial evidence of harm. The hearing in this action was held after the Court of Appeals' reversal of *Masel*. At this hearing plaintiff remedied the deficiency, offering substantial proofs of irreparable harm.

"To obtain a preliminary injunction in this circuit, a party must make 'a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.' *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam);" *Bell & Howell : Mamiya Co. v. Masel Supply Co.*, 719 F.2d at 45. I find that the standard has been thoroughly and convincingly met. I find that plaintiff has proved entitlement to the preliminary injunction under the Exclusion Act, 19 U.S.C. § 1526, and, although it is unnecessary at this stage to decide on additional grounds, under the trademark laws as well.

### I. *Facts*

Plaintiff is the duly registered owner in the United States of the Mamiya marks. Although a controlling interest of plaintiff's stock is owned by Osawa-Japan, plaintiff functions as a legally separate entity with its board of directors and executive staff. For a number of years it has been the exclusive distributor of Mamiya products in the United States. Over these years (including also the period during which plaintiff was 50%-owned by Bell & Howell Company), plaintiff has devoted extensive expenditures, activities and energies to the successful development of goodwill for the Mamiya marks.

The Mamiya equipment is sophisticated and expensive, designed for use by professional photographers and advanced amateurs. Accordingly it includes a wide

range of peripheral equipment designed for special applications. In order to be able to supply promptly the needs of its professional photographer customers, plaintiff maintains at all times a stock of all such peripheral equipment.

Plaintiff purchases advertising and incurs other public relations expenses. To educate users, dealers and potential customers in the advantages and complex capabilities of its equipment, it organizes seminars, which are conducted in various parts of the country. To stimulate sales, it occasionally offers rebates, sometimes consisting of a free piece of peripheral equipment to one who purchases a Mamiya camera during a specified period.

Plaintiff distributes the Mamiya equipment through authorized camera dealers who apply for dealerships. Plaintiff's sales policy is based on its perception of a fundamental difference between equipment of such complexity and a simple amateur's camera. Because of the high cost and complexity of the equipment and because of the sophisticated demands of purchasers, plaintiff foresees a continuing relationship between dealer and customer involving advice, service and the future purchase of specialized peripheral equipment expanding the capabilities of the camera. According to its perception, a purchaser of a Mamiya camera who was unable to obtain such support from his dealer would soon be a dissatisfied customer. Accordingly, plaintiff has been unwilling to distribute its equipment through any camera store but will authorize and sell only to those dealers who demonstrate a willingness to take in an adequate full line stock so that they will be both able and motivated to service future needs of their customers.

Plaintiff also devotes considerable care to handling, including inspection on arrival. It offers free warranty repairs, performed either by its employees or by authorized service representatives, who must receive training in the equipment.

Defendants are discount camera dealers, offering camera equipment often at prices substantially cheaper than are available at other stores. Defendants advertise in national photography magazines. These advertisements characteristically are concerned with price; they set forth, mostly in small print, items of available equipment with prices. They sell by mail and by telephone to credit card purchasers, as well as over the counter. Defendants formerly were authorized Mamiya dealers purchasing from plaintiffs. Their dealerships were terminated as a result of the dispute over grey market merchandising.

Defendants advertise and sell Mamiya equipment that has been imported in violation of the Customs exclusion order. They are found also to have imported such merchandise.[2] They sell this equipment at retail prices far below the prices of authorized dealers. In some cases they sell at prices cheaper than those at which plaintiff offers its merchandise to its dealers.

The reasons for the price disparity have not been fully shown by the evidence. Defendants contend it is because Osawa-Japan, the worldwide distributor, discriminates against the U.S. consumer by selling to plaintiff at arbitrarily higher prices than it charges to distributors in other countries. However, defendants have offered no proof that this is true. Nor have they shown in which countries their equipment is purchased or from whom.

Plaintiffs point to several possible factors explaining price differences. One is currency fluctuation, especially the recent strength of the U.S. dollar as against certain European currencies. Another possible explanation suggested by plaintiff is price differences set by Osawa-Japan that

---

**2.** Defendants have never denied dealing in grey market Mamiya cameras. They initially denied importing the cameras, contending rather that they purchased them from the grey market importers. During discovery, B & H refused to identify its seller, giving as the reason for refus-

al the close relationships among this community of camera dealers. B & H was offered the choice of disclosing its source or being found to be the importer as a sanction under Rule 37, F.R.Civ.P. It chose rather to accept the finding.

are not arbitrary or discriminatory but are justified by differing cost factors.[3]

Third, plaintiff has convincingly proved that in support of the Mamiya trademarks it incurs substantial costs that defendants do not have. These include the whole range of activities described above in which plaintiff engages in order to create, maintain, protect and enhance the goodwill of the Mamiya marks.[4]

Defendants seek to undercut this proof by showing that they too incur expenses of similar nature. But their contentions miss the point and do not alter the conclusion. For example, defendants point out that they also advertise, contending that this undermines plaintiff's argument as to its advertising expenses. Indeed defendants place ads, but they do not undertake advertising to publicize the quality of the Mamiya products. To the extent their ads mention the Mamiya name, it is only to show, in a one-line-per-item listing, how cheap their prices are. Thus it misses the point to say they have advertising. The expense they do not have is advertising to support the Mamiya marks.

Similar observations are pertinent as to handling expenses. No doubt the defendants incur some handling expenses. But defendants have no incentive to support the goodwill of any mark they sell; their sales are based solely on price advantage. It stands to reason that they conduct their operations as cheaply as possible and do not undertake the same degree of care (equals expense) in inspection and handling as plaintiff does to insure consumer satisfaction with Mamiya products.

Defendants' response is also inadequate on the subject of inventory costs. It was noted above that plaintiff maintains a vast inventory of related peripheral gadgets of special application to be able to satisfy promptly the needs of its professional photographer customers. Plaintiff contends convincingly that this is another cost not incurred by defendants. Defendants try to counter this point by showing that their purchase invoices over a substantial period have included every item in plaintiff's catalogue. This altogether misses the point. Defendants may well have sold every catalogue item at one time or another. That does not show that defendants maintain an inventory. Defendants have no reason to engage in such an expensive practice, and there is no evidence that they have done so.

Defendants of course have borne no warranty service expense. This is a particularly significant item in several respects. First, plaintiff has not only borne warranty expenses on its own merchandise but has also provided warranty service on grey market equipment sold by defendants. Defendants argue that the latter injury is self-inflicted. Plaintiff has no obligation to warranty defendants' sales and could refuse the service. Defendants also argue that plaintiff could handle the packaging and warranty cards in such a way as to make the purchasing public better aware which cameras were warrantied and which were not. These observations are factually correct but miss the point. Plaintiff gives warranty service on defendants' grey market sales not out of stupidity or neglect but because plaintiff's management perceives that dissatisfied purchasers of Mamiya cameras will damage the reputation of the Mamiya mark, which is the most significant asset on which plaintiff's business is founded. The customers do not know the cameras they purchased are from the grey market because defendants do not tell them. Thus, as to warranty repairs, not only are defendants operating free of a

---

3. As a possible example, there is evidence that Osawa-Japan and Mamiya Co. are contractually obligated to plaintiff to contribute to plaintiff's expenses of advertising and warranty repairs. It is possible that such commitments result in a higher price charged by Mamiya Co. for the merchandise shipped to plaintiff for U.S. sales.

4. An issue left in some doubt was whether defendants' grey goods pay Customs duties on importation. It is clear Customs is not told it is Mamiya cameras that are being imported since such a declaration would result in their seizure. Defendants have offered no evidence that the goods were declared or duty paid.

significant cost that plaintiff bears, but their sales increase plaintiff's cost.

Similarly, it is all very well for defendants to argue that plaintiff can protect itself to a degree by spending additional money so as to better warn the public which cameras carry, and which do not carry, warranties. It seems to me a significant equitable factor that defendants could also have undertaken to warn their customers that their merchandise was not imported by the authorized U.S. Mamiya distributor and carried no warranty protection. Instead the opposite has been done. B & H has delivered to its customers a notice that falsely advises that the merchandise is protected by the manufacturer's warranty and instructs the customer that "if you bring or send the [defective] item to a manufacturer's authorized service agency, your item will be repaired at no cost to you." *See* Plaintiff's Exhibits 79, 80, 85. This aspect of the defendants' conduct can be properly characterized as bad faith. It deceives the public and conceals the significance to the customer of the double market structure defendants have created. Defendants tell the customers the good news about their cheap prices. But they conceal or affirmatively misrepresent the bad news. Plaintiff is left with the choice of providing free warranty service on defendants' merchandise or suffering damage to the reputation of its marks.

Defendants now state that they will offer their own warranty service on their grey Mamiya merchandise. Apart from the fact that this is a newly contrived litigation strategy designed to deal with a glaring weakness in defendants' position, it is also an unsatisfactory resolution that (in ways discussed below) risks to increase, rather than solve, the problems of trademark confusion.

## II. *Irreparable Harm*

I turn now to the issue of likelihood of confusion and irreparable harm, which was insufficiently proved in *Masel*, but which here was proved in abundance. Plaintiff has shown consumer confusion, damage in consumers' eyes to the reputation of the mark, and devastating effects on plaintiff's business resulting from defendants' grey market imports.

Plaintiff has shown a drastic decline in its sales in 1983 as compared with average levels over the past nine years. Concommitantly, it has laid off a large part of its personnel, including a significant part of the repair force, and has suffered consequent delays in time needed for warranty repairs. The advertising budget for the Mamiya mark has been severely slashed. Competition from grey marketers has caused demoralization, disaffection and misunderstanding among authorized dealers, 40% of whom have dropped the Mamiya line since 1980. There is evidence that some dealers have misunderstood the cause of the problem, believing that plaintiff was granting preferred price treatment to their competitors.

Another aspect of the harm is that plaintiff's advertising expenditures and public relations efforts are incurred largely for the benefit of its competitors, the grey market sellers, who free ride on plaintiff's publicity.

Also in order to avoid consumer confusion, disaffection and resentment, plaintiff has performed warranty repairs and honored rebate offers on grey market cameras, essentially furnishing free service and benefit to support the sales of its competitors.

A number of the circumstances mentioned above as harmful to plaintiff's business also cause damage to its goodwill and to the public reputation of its Mamiya marks. Naturally, a reduced advertising budget means reduced opportunity to publicize the marks and consequently further reduced sales. The widespread disaffection among authorized dealers by reason of the grey market price competition creates a substantial risk of loss of enthusiasm or bad-mouthing (where it matters most since buyers are likely to look to dealers for advice on brands and equipment). Delay in performing warranty repairs as a result of staff reductions also creates resentment directed against the brand. Plaintiff's rep-

utation also suffers when defendants perform inadequate inspections of merchandise. For example, grey market cameras have been found to contain instruction manuals written in foreign languages, which causes understandable consumer dissatisfaction.

The issue of warranties, discussed above, is of significant importance on the subject of irreparable harm and confusion. For such an expensive, complicated and sensitive piece of equipment, a prospective purchaser wants assurance that a responsible organization stands behind and guarantees the equipment. The submission to plaintiff of grey market cameras claiming for warranty repairs is significant evidence of consumer confusion. If plaintiff refuses to honor these claims, further confusion will result, coupled with public mistrust of the mark. If it does honor these warranty claims, it is subsidizing its competitors' business. As noted above, B & H's misleading assurance that the goods are warranted by the manufacturer has unnecessarily increased such confusion. Similar confusion arises when grey market cusomters apply for the benefits of plaintiff's offers of rebates. Again its choice is essentially to risk the confusion and resentment (which defendants have done nothing to obviate) or to subsidize defendants' sales by honoring the claims.

Consumer confusion also arises from the wide price disparities between legitimate and grey imports. Consumers will wonder why the same equipment can be purchased so much more cheaply at one place than at others. Many will no doubt assume the explanation is that plaintiff is gouging, which will engender hostility to the mark.

Counsel for B & H has conducted an extraordinarily vigorous and imaginative, although ultimately unpersuasive, defense. As to each item of harm, defendants contend that it is either exaggerated or attributable to a different cause, in many cases self-inflicted. Of course, in economic analysis, no single answer is ever complete or sufficient. There is undoubtedly a measure of validity to some of counsel's arguments, but they do not undercut the essential persuasiveness of the plaintiff's case.

As to confusion over the warranty obligation and rebates, defendants argue (and the Court of Appeals in *Masel* suggested) that the confusion can be avoided or diminished if plaintiff includes in its packages forms essential to claim these benefits. Defendants show that Hasselblad, a medium-format competitor, has adopted the use of such forms. While it is no doubt true that by reliance on such forms plaintiff might diminish confusion and reduce its receipt of warranty claims for grey cameras, this would not deal adequately with the problem of confusion and loss of goodwill. Many purchasers of grey goods would not realize they lacked warranty protection until they sought to claim. The realization would come too late and would engender hostility.

Furthermore, the argument sits ill in the mouth of B & H since it has gratuitously contributed to the confusion in the manner described above.

As noted above, B & H has developed a new strategy in litigation and now undertakes that it will warrant the grey Mamiya merchandise that it sells. (It also offers to parallel all Mamiya rebate offers by similar offers of its own.) This ingenious stratagem, however, offers only a superficial solution. More realistically it can be seen as aggravating the problem. For the warranty is of value to the goodwill of the mark only if offered by one who has the incentive to uphold the reputation of the mark. B & H would have no such incentive. Plaintiff would have no assurance that B & H's warranty repairs would be properly performed or that the obligation would be graciously accepted. It would be constantly subject to the risk that B & H would disavow the obligation or perform inadequate repairs. Disparities between plaintiff's and defendants' performance of warranty work would further confuse the marketplace as to the standing and meaning of the Mamiya mark.

I note, in response to a question raised by the Court of Appeals in *Masel*, that

plaintiff cannot be adequately protected by the remedy of accounting. An accounting could not purport to protect against consumer confusion, loss of goodwill and injury to the reputation of the marks. Even as to transfer of the grey marketer's profits, the remedy is inadequate in these circumstances. For grey marketers operate at (or outside) the fringes of legality. Their operations are in large part held in secrecy, as evidenced by the defendants' refusal to furnish essential disclosure in the discovery proceedings. Their business records, to the extent here disclosed, are scanty and informal. Furthermore, it appears that there are numerous dealers in grey market merchandise. It would be both difficult and expensive for plaintiff even to know their identities, much less to attempt to monitor their sales. In short, there is no way plaintiff could rely on an accounting to give it any reasonable protection.

I find that within the meaning of the *Masel* case and the numerous prior precedents, plaintiff has proved that it has suffered irreparable harm and will continue to suffer it if a preliminary injunction is not granted pending final resolution on the merits.

### III. *Balance of Hardships*

The balance of hardships tips decidedly in plaintiff's favor as does the balance of the equities. The principal undertaking of plaintiff's business is the promotion of the Mamiya marks in connection with the importation and distribution of Mamiya equipment. Plaintiff has already suffered great injury to that business and will continue to suffer if grey marketing continues. It has incurred big losses and contends convincingly that its survival is threatened.

The hardship that would be imposed on defendants by a preliminary injunction is of a comparatively trivial order. Defendants are dealers in all manner of photographic equipment. Undoubtedly they are realizing significant profits from dealing in Mamiya grey goods, but there is no suggestion that an injunction foreclosing this element of their profits would have any serious impact on the overall conduct of their business.

Defendants furthermore have no expectation of making such profits a continuing aspect of their business. These profits are available to defendants only because they have been willing to violate a U.S. Customs order. If the lawfulness of the Customs order is sustained in the final resolution of this litigation, defendants will of course be barred from further pursuing those profits. And even if they win the litigation and procure a judgment voiding the Customs order of exclusion, that will also deprive defendants of the opportunity to earn these profits. For then they will face open competition from those who are now deterred by sensitivity to the illegality of such importing, whereas now the competition is restricted to those prepared to violate the Customs order. It is therefore clear, balancing not only the weight of the hardships but the equities as well, that the balance tips decidedly in plaintiff's favor.

### IV. *The Merits*

Although the Court of Appeals' discussion in *Masel* focused on proofs of harm and included no discussion or ruling on the substantive legal questions, it could be construed to express skepticism as to whether an infringement action can lie against goods genuinely marked abroad.[5]

I respectfully believe that when the issue presents itself for full review, any such doubts will be resolved, *see A. Bourjois & Co. v. Katzel*, 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464 (1923); *A. Bourjois & Co. v. Aldridge*, 263 U.S. 675, 44 S.Ct. 4, 68 L.Ed. 501 (1923) (per curiam); *Model Rectifier Corp. v. Takachiho International, Inc.*, 221 U.S.P.Q. 502 (9 Cir.1983); *Sturges v. Clark D. Pease, Inc.*, 48 F.2d 1035 (2 Cir.1931) (A.N. Hand, J.); *E. Leitz, Inc. v. Watson*, 152 F.Supp. 631, 635–37 (D.D.C.

---

**5.** And in *DEP Corp. v. Interstate Cigar Co.*, 622 F.2d 621 (2 Cir.1980), an opinion decided solely on the basis that plaintiff was not the owner of the trademark, which included no discussion of the theories or authorities relevant to the substantive issue of infringement, a dictum set forth in a footnote expressed such doubt. *See id.* at 622 n. 1.

1957), *aff'd,* 254 F.2d 777 (D.C.Cir.1958); *Roger & Gallet v. Janmarie, Inc.,* 245 F.2d 505 (C.C.P.A.1957). I find likelihood of success on the merits (and *a fortiori* a fair ground for litigation), and I accordingly grant a preliminary injunction.

## A. *Universality, Territoriality and a Separate Local Goodwill*

A hundred years ago the view was widely held that if a trademark was lawfully affixed to merchandise in one country, the merchandise would carry that mark lawfully wherever it went and could not be deemed an infringer although transported to another country where the exclusive right to the mark was held by someone other than the owner of the merchandise. *See* Derenberg, *Territorial Scope and Situs of Trademarks and Good Will,* 47 Va.L.Rev. 753 (1961). This view, sometimes referred to as the "universality" principle, underlay a series of decisions of the Circuit Court under which U.S. trademark owners holding contracts for the exclusive right to import foreign trademarked goods were held powerless as against others who purchased abroad goods genuinely marked abroad and imported them to the U.S. for sale. *See Apollinaris Co. v. Scherer,* 27 F. 18 (C.C.S.D.N.Y.1886); *Fred Gretsch Mfg. Co. v. Schoening,* 238 F. 780 (2 Cir.1916); *A. Bourjois & Co. v. Katzel,* 275 F. 539 (2 Cir.1921), *rev'd,* 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464 (1923).

However, the Court of Appeals' *Bourjois* decision was overturned both by Act of Congress, *see* Tariff Act of 1922, Pub.L. No. 67–318, tit. III § 526, 42 Stat. 858, 975 (1922), and by the Supreme Court, *see A. Bourjois & Co. v. Katzel,* 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464 (1923). In *Katzel,* plaintiff had purchased the U.S. business and the U.S. trademark rights for JAVA, a French cosmetic powder. The defendant purchased genuine JAVA powder in France, imported it to the U.S. and sold it under the JAVA mark. The district court had granted plaintiff an injunction. The Court of Appeals vacated the injunction, holding that since defendant's merchandise

was genuine French JAVA powder there could be no infringement. In an oft cited opinion of Justice Holmes, the Supreme Court reversed and reinstated the injunction, explaining that the true significance of the trademark was not to indicate the origin or manufacture of the goods, but rather to signify the local business goodwill of the domestic owner of the mark. *See* 260 U.S. at 692, 43 S.Ct. at 245. The genuine French JAVA powder was found to infringe the U.S. owner's exclusive right to that mark.

Later that year, in *A. Bourjois & Co. v. Aldridge,* the theory of *Katzel* was extended to § 27 of the Trademark Act of 1905, the predecessor of § 42 of the Lanham Act, 15 U.S.C. § 1124, which excluded from entry into the U.S. marks that "copy or simulate" registered U.S. marks. The Supreme Court ruled, in favor of the same plaintiff, that the Collector of Customs was required to exclude from entry genuine goods bearing the French "manon Lescaut" mark, because the French mark was held to "copy or simulate" the assignee's identical U.S. mark.

While *Katzel* was pending in the Supreme Court, Congress likewise acted to overturn the decision of the Court of Appeals. In 1922, it passed the Genuine Goods Exclusion Act, § 526 of the Tariff Act of 1922 (later reenacted as § 526 of the Tariff Act of 1930), 19 U.S.C. § 1526. This statute made it illegal to

> import into the United States any merchandise of foreign manufacture if such merchandise ... bears a trademark owned by a citizen of, or by a corporation ... created or organized within, the United States ... unless the written consent of the owner is produced at the time of making entry.

Since Holmes' decision, the universality principle has faded and been generally supplanted by the principle of "territoriality," upon which the *Bourjois* rulings were based. This principle recognizes that a trademark has a separate legal existence under each country's laws, and that its proper lawful function is not necessarily to

specify the origin or manufacture of a good (although it may incidentally do that), but rather to symbolize the domestic goodwill of the domestic markholder so that the consuming public may rely with an expectation of consistency on the domestic reputation earned for the mark by its owner, and the owner of the mark may be confident that his goodwill and reputation (the value of the mark) will not be injured through use of the mark by others in domestic commerce. *See A. Bourjois & Co. v. Katzel,* 275 F. 539, 543–44 (2 Cir. 1921) (Hough, J., dissenting). *See also Sturges v. Clark D. Pease, Inc.,* 48 F.2d 1035 (2 Cir.1931); *E. Leitz, Inc. v. Watson,* 152 F.Supp. 631, 635–37 (D.D.C.1957), *aff'd,* 254 F.2d 777 (D.C.Cir.1958); *Roger & Gallet v. Janmarie, Inc.,* 245 F.2d 505, 509–10 (C.C.P.A.1957). The territoriality of trademark rights is reflected in several Supreme Court opinions, which ground the doctrine in the independent sovereignty of nations, *see Ingenohl v. Walter E. Olsen & Co.,* 273 U.S. 541, 544, 47 S.Ct. 451, 452, 71 L.Ed. 762 (1927); *Baglin v. Cusenier Co.,* 221 U.S. 580, 594–97, 31 S.Ct. 664, 672–74, 55 L.Ed. 863 (1911); *see also George W. Luft Co. v. Zande Cosmetic Co.,* 142 F.2d 536, 539 (2 Cir.) *cert. denied,* 323 U.S. 756, 65 S.Ct. 90, 89 L.Ed. 606 (1944), as well as in the view that trademark rights arise out of use of the mark in a particular geographic market, *see United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 98, 39 S.Ct. 48, 51, 63 L.Ed. 141 (1918); *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 415–16, 36 S.Ct. 357, 361, 60 L.Ed. 713 (1916); *see also La Societe Anonyme des Parfums LeGalion v. Jean Patou, Inc.,* 495 F.2d 1265, 1271 (2 Cir.1974).

The universality principle upon which the older cases had been decided was flawed in several related respects. First, it failed to recognize that legal rights within one sovereignty are creatures of that sovereignty's law. The establishment by A of legal rights to exclusivity in one country could obviously not satisfactorily be squared with B's establishment of exclusive right in a second country, if either right (much less if both) were thought to extend across the world universally. The principle was perhaps based on an idealistic view of the world as a single marketplace. That view, however, did not conform to reality or to international treaty. While it might have been possible to imagine the development of a unified world marketplace, organized on the same set of assumptions that have dominated the creation of a single marketplace among the United States, the development between nations did not occur in that fashion. *See* Paris Convention for the Protection of Industrial Property, March 20, 1883, *as revised,* art. 6, *quater,* 21 U.S.T. 1583, 24 U.S.T. 2140, T.I.A.S. No. 6923, 7727 (authorizing territorial assignments of trademark rights subject to national law); General Inter-American Convention for Trade Mark and Commercial Protection, Feb. 20, 1929, art. 11 (authorizing territorial transfers given reliable proof, subject to national law of transfer and registration). *See generally* Derenberg, *Current Trademark Problems in Foreign Travel and the Import Trade,* 49 T.M.R. 674, 690–96 (1958).

A second flaw, an outgrowth of the first, is the failure to recognize that, within one country, a mark may represent a factually different goodwill from that which the mark signifies elsewhere. A few examples illustrate the importance of the distinction between the goodwill associated simply with the product name and that of the domestic distributor.

(a) Suppose a manufacturer makes in Japan and sells under his trademark X a fine computer; the reputation of the X mark is high in the country of manufacture and in certain other countries, where it is distributed and serviced under equally high standards. However, the U.S. distributor and owner of mark X conducts its business in a shoddy way: fails to inspect the equipment for damage upon importation; handles it without care in distribution; fails to stock and make available a broad inventory of needed parts and attachments; fails to provide user instruction programs; establishes no maintenance and repair ser-

vice; provides grudging, slow and incompetent warranty service or no warranty at all. It is readily perceived that mark X will have an altogether different value and significance in the U.S. than elsewhere, because the mark does not merely identify the manufacturer; it signifies the goodwill (or in this example the badwill) of the U.S. owner.

(b) Keeping the same basic example but altering certain facts, suppose the local owner of the X mark earned an excellent reputation not only by selling quality equipment under the mark but also by conscientiously providing all the peripheral services whose absence was noted in (a). Then the mark will come to represent an excellent public reputation. It is easy to see, in connection with the present dispute, how the reputation attached to the mark of a conscientious domestic distributor could be seriously injured if strangers were free to import and sell the computer under its brand name. For they would be trading on X's earned *domestic* reputation and would have no incentive to insure the continuing goodwill of the mark. Purchasers from the grey market importers, although buying essentially the same equipment, might receive damaged goods, unsatisfactory warranty protection or inadequate service, etc. The reputation of the X mark would inevitably be damaged at the markholder's expense for deficiencies over which he had no control.

(c) The point is still more clearly made if the foreign markholder and the domestic markholder seek to develop the goodwill in different directions. Suppose that the mark had originally applied to conservative, costly, French high fashions and continued to be used only in that manner in the U.S. with great success, but that in the meantime the French

trademark owner finds for whatever reasons that his profits are dwindling in the French market and decides to use the famous mark on a new line of low-priced clothes of daring fashion catering to the young and wild. Third parties then import the cheap, young and wild clothes bearing their "genuine" French mark to the U.S., where the mark has been developed by its local owner as a status symbol catering to the wealthy and conservative. If the U.S. mark owner were powerless to prevent the marketing of the new French line in the U.S. under his mark, he would promptly suffer a destruction, or in any event a drastic alteration, of the goodwill associated with his U.S. mark.

These examples illustrate that a mark may have not only a separate legal basis but also a different factual significance in each separate country where the local mark owner has developed an independent goodwill. That is the basis of the territoriality principle recognized by Justice Holmes in the *Bourjois* decisions. The principle has become still more solidly implanted in United States law by the 1962 amendment to § 32 of the Lanham Act, 15 U.S.C. 1114, which repealed the requirement that a plaintiff in a trademark action show confusion as to "source of origin" of the goods. *See Syntex Laboratories, Inc. v. Norwich Pharmacal Co.*, 437 F.2d 566, 568 (2 Cir.1971).[6]

The universality decisions were superficially and deceptively consistent with the trademark doctrine of "exhaustion." Under this doctrine, as applied within the borders of a sovereignty, a markholder may no longer control branded goods after releasing them into the stream of commerce. After the first sale, the brandholder's control is deemed exhausted. Down-the-line retailers are free to display and advertise

---

**6.** Certain commentators in the 1950's took the view that the goodwill associated with a so-called "worldmark" could have as its situs only the place where the goods were made. *See* Vandenburgh, *The Problem of Importation of Genuinely Marked Goods is not a Trademark Problem*, 49 T.M.R. 707 (1959); Callman, *World-*

*marks and Antitrust Law*, 11 Vand.L.Rev. 515, 518–19 (1958). For reasons just explained, I reject this narrow view. *See* Derenberg, *Territorial Scope, supra*, at 736–37 and 750 (establishment by domestic markholder of local goodwill justifies trademark protection against grey market imports).

the branded goods. Secondhand dealers may advertise the branded merchandise for resale in competition with the sales of the markholder (so long as they do not misrepresent themselves as authorized agents). *See Prestonettes, Inc. v. Coty*, 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731 (1924); *Trail Chevrolet, Inc. v. General Motors Corp.*, 381 F.2d 353 (5 Cir.1967); *Chrysler Corp. v. Thayer Plymouth Center, Inc.*, 303 F.Supp. 543 (C.D.Cal.1969). *See generally* 3A R. Callman, *The Law of Unfair Competition, Trademarks, and Monopolies* § 21.17 (4 ed. 1983). The application of the exhaustion concept to international trade seemed to suggest that once the original mark owner had lost control of the marked goods by releasing them into commerce, his assignee in a foreign country could not logically own rights superior to those of the assignor. The right of control seemed exhausted.

This reasoning is flawed, however, where the assignee of the mark in the second country has developed a separate, factually independent goodwill. If no such independent goodwill has been developed, then in spite of recognition of territorial limits, arguably there might be no infringement. If the U.S. mark represents nothing more than a foreign outpost of the goodwill associated with the original mark, it might well be argued that exhaustion has taken place with the release into commerce and that no infringement occurs on unauthorized importation. *See* Derenberg, *Territorial Scope, supra.*[7] But where, as here, the U.S. assignee has developed a separate goodwill factually independent from that of the mark originator, whatever exhaustion occurred with the original release into commerce was the exhaustion of a legally distinct and factually different mark. Thus, the development by the assignee of a sepa-

rate and distinct U.S. goodwill was a crucial finding in *Katzel*, made by the district court, *see* 274 F. 856, 857 (S.D.N.Y.1920), and underlined in Holmes' opinion.[8]

### B. *Defendants' Contentions*

Defendants here seek to apply the principles of exhaustion on an international scale, arguing that once the goods bearing the Mamiya mark have been sold in commerce, bringing a profit to the original markholder, neither the original markholder nor his assignees may exert control over them. This position might have substantial force if no independent U.S. goodwill were represented by the Mamiya marks.

■ However, plaintiff has proved convincingly that, as the result of its efforts, it has developed in the United States marketplace a substantial goodwill separate and distinct from the goodwill emanating from the branded goods themselves. This local goodwill is the product of plaintiff's many U.S. activities (described above) promoting and standing behind the mark, including significantly warranty service, promotional rebates, educational activities and advertising. The Mamiya trademark in the U.S. represents a goodwill generated and importantly influenced by these activities. It is not the same trademark either in law or in fact as the Mamiya trademark at the place of manufacture, where it designates only the goodwill of the manufacturer.

Defendants rely on the turn-of-the-century cases noted above. They argue that both § 526 and the Holmes *Bourjois* decisions should be narrowly limited to situations where the domestic markholder had purchased outright the U.S. mark and goodwill and was not related to the foreign mark originator.

---

**7.** This might justify the result, though not the stated reasoning, of *Apollinaris, supra.* The mark there applied to bottled water from a Hungarian natural spring. It may well be that the U.S. mark owner had developed no independent separate goodwill.

**8.** It is said that the trade-mark here is that of the French house and truly indicates the ori-

gin of the goods. But that is not accurate. It is the trade-mark of the plaintiff only in the United States and indicates in law, and, it is found, by public understanding, that the goods come from the plaintiff although not made by it.

260 U.S. at 692, 43 S.Ct. at 245.

I find no basis for this contention either in fact or in logic. The old universality cases and the theory upon which they rest represent an incorrect analysis that has been repudiated in both statutory and decisional law, at least where the domestic markholder has developed an independent goodwill.

And as to the Exclusion Act, § 526, defendants' attempt to contradict its plain meaning by snatching at fragments from its legislative history is unconvincing. The fact that it was passed to overturn the Court of Appeals decision in *Katzel* does not mean that, in spite of its broad language, it should govern only the narrowest version of the *Katzel* facts. Defendants have suggested no compelling reason to doubt that the statute means what it says.

Defendants seek support for their argument in the opinion of Judge Learned Hand in *Coty, Inc. v. LeBlume Import Co., Inc.*, 292 F. 264 (S.D.N.Y.), *aff'd*, 293 F. 344 (2 Cir.1923). That decision does not support the inferences defendants seek to draw from it. To the contrary, it is support for the opposite conclusion. That case involved cross actions between a U.S. corporation owned by the famous French perfumer Coty and a U.S. competitor Le Blume who sought to market perfume under the name Origan, over which Coty held trademark rights both in France and in the United States. U.S. Coty had obtained a customs order of exclusion under the Exclusion Act, which had resulted in the detention of Le Blume's merchandise. The pertinent part of the opinion is the last paragraph, which deals with Coty's motion to dismiss Le Blume's suit to vacate the order of exclusion. Judge Hand denied the motion ruling that the exclusion statute did not deprive the importer of the right to test the validity of the trademark in the courts. Judge Hand then wrote:

> Section 526(a) ... was intended only to supply the casus omissus, supposed to exist in section 27 of the Act of 1905 ..., because of the decision of the Circuit Court of Appeals in Bourjois v. Katzel.... Had the Supreme Court re-

versed that decision last spring, it would not have been enacted at all.

292 F. at 268–69.

Section 27 of the Act of 1905 had given Customs authority to exclude imported goods that "copy or simulate" a registered U.S. mark. However, in *Gretsch v. Schoening, supra*, the Court of Appeals had held that § 27 could not be invoked by the owner of a valid U.S. trademark against goods bearing the genuine mark of the foreign manufacturer, as the importation and sale of such genuine goods did not infringe the U.S. mark. The Court of Appeals in *Katzel* reaffirmed the principle, citing *Gretsch*. When Holmes reversed *Katzel*, finding infringement despite the "genuineness" of the imported goods, a corollary implication was, as indeed the Supreme Court was soon to rule in *Aldridge*, that such "genuine" marks, being infringers, would also be excludable under § 27. Thus, in Judge Hand's terms, the "casus omissus, supposed to exist in § 27" was foreign goods with genuine marks imported in derogation of the U.S. mark owner's trademark rights. This previously supposed omission from the coverage of § 27 was independently plugged both by the passage of § 526 and by the *Bourjois* decisions. What Hand's observation meant was only that the passage of § 526 would have been unnecessary and would not have occurred if the *Bourjois* Supreme Court decisions had been rendered earlier, bringing such "genuine" goods within the coverage of § 27. There is absolutely no basis in Hand's language for the suggestion argued by defendants that it refers only to the arm's-length relationship between the domestic and foreign markholders in *Katzel*. In fact it must mean the opposite. For it is clear (and beyond dispute) that exclusion lay under § 27 against goods that "copy or simulate" regardless of relationship between the domestic and the foreign mark holder. Such a relationship would have no conceivable relevance to the unlawfulness of a counterfeit mark. If, as Judge Hand states, § 526 simply fills the omission supposed to exist in § 27, then the relationship between foreign and domestic mark-

holder would be equally irrelevant under § 526.

Defendants' next arguments are that this interpretation of the trademark laws and of § 526 fosters anticompetitive practices, discriminatory pricing and violations of antitrust law and policy. Defendants argue that the opportunities for grey marketing are necessarily the consequence of an attempt by Osawa-Japan to discriminate against the U.S. consumer by charging higher prices to its U.S. distributor than it charges to distributors elsewhere. The only way to prevent this, defendants contend, is to construe the trademark laws as they advocate.

There are several sufficient answers to this contention. First, as noted above, there are many possible explanations why a grey market importer can sell cheaper than the exclusive distributor. Although arbitrary price discrimination is one possible explanation, there are many others, as noted above, including particularly fluctuations in international currency markets, differing cost conditions in other countries, and the fact, amply demonstrated here, that the plaintiff-markholder incurs many costs that the grey marketer does not. These include, at a minimum, all the costs incurred for the maintenance and enhancement of the mark's reputation, such as advertising and public relations, consumer and dealer education, warranty service, and maintenance of inventory. No proofs have been adduced by defendants that arbitrary price discrimination was practiced by Osawa-Japan.

But even assuming that it was, and assuming further that those practices violated the antitrust laws or other laws governing fair business practice, it does not follow that the problem should be remedied by an illogical misapplication of the trademark laws. A trademark is, like a patent, a monopoly conferred by law. Unquestionably they are susceptible to abuse and to employment in illegal fashion. When this occurs, the proper remedy is either to deny enforcement in appropriate instances or to impose liability by reason of the finding of

unfair competition, violation of the antitrust laws or whatever, and not by distortion of the trademark laws in a fashion that will defeat legitimate trademark expectations.

This raises the curious history of the perfume antitrust actions, *see United States v. Guerlain, Inc.*, 155 F.Supp. 77 (S.D.N.Y.1957), *vacated and remanded*, 358 U.S. 915, 79 S.Ct. 285, 3 L.Ed.2d 236 (1958), *action dismissed*, 172 F.Supp. 107 (S.D.N.Y.1959), and the subsequent Customs regulations under § 526, all of which are so lucidly discussed in Judge Neaher's fine opinion in *Masel*.

In *Guerlain*, the Justice Department had instituted an action against U.S. distributors of French perfumes each of which was found by the district court to be part of a "single international enterprise" that included a French trademark owner. The Government contended initially that their obtaining of exclusion orders under § 526 violated § 2 of the Sherman Act. The district court found in favor of the Government. However, on appeal to the Supreme Court, the Government reversed its position, apparently believing that such changes in the law as it sought must come from legislation rather than adjudication. The Supreme Court vacated the district court's order, 358 U.S. 915, 79 S.Ct. 285, 3 L.Ed.2d 236 (1958), and the action was subsequently dismissed with prejudice at the instance of the Government, 172 F.Supp. 107 (S.D.N.Y.1959). Legislation that was later proposed, H.R. 7234, 86th Cong., 1st Sess. (1959), was never enacted.

In the meantime Customs, apparently influenced by the thinking of the Justice Department that prompted the bringing of the *Guerlain* action, adopted regulations that substantially narrowed the rights conferred by § 526. These regulations denied the remedy of exclusion provided by § 526 if the foreign and U.S. trademarks were owned by "related" companies. 19 C.F.R. § 11.14(b) (1954). Although this limitation was dropped by Customs after the dismissal of the *Guerlain* cases, *see* 19 C.F.R. §§ 11.14 and 11.15 (1960), its substance

was reasserted by Customs in new regulations in 1973. The current regulations deny exclusion in various circumstances including where the foreign and domestic holders are in a parent-subsidiary relationship or otherwise are under common ownership or control. 19 C.F.R. §§ 133.21(c)(2), 133.2(d) and 133.12(d).

The pertinence of the Customs regulations to this action arises from defendants' contention that Customs violated them in granting the exclusion order to plaintiff. They contend that Osawa-Japan controls Mamiya Co. through its 30% ownership, as well as controlling plaintiff, with the result that "the foreign and domestic trademark ... owners are ... subject to common ... control ....", 19 C.F.R. § 133.21(c)(2).[9] Accordingly, defendants argue that plaintiff is ineligible to receive an exclusion order, and that it should be vacated.

Accepting the regulations at face value, defendants have not shown that they were inaccurately, unfairly or wrongly applied. It is noted that defendants have not availed themselves of their statutory right to challenge Customs' determinations by protest under 19 U.S.C. § 1514. In any event, defendants' proofs do not demonstrate that Customs' factual determination was in error.

I note in passing, however, that the more substantial question, which need not be decided here in view of Customs' grant of an exclusion order to plaintiff, is whether Customs exceeded its authority in promulgating the regulations in question. The language of the statute broadly and unqualifiedly proclaims the unlawfulness of importing "any merchandise of foreign manufacture ... [that] bears a trademark owned by a citizen of, or by a corporation or association created or organized within, the United States ...." It contains no suggestion that the right of the U.S. markholder to receive its benefits depends on subtle variations in its relationship with the foreign markholder.

The promulgation of the regulations represented an effort on the part of Customs to implement its perception of antitrust policy. *See* Atwood, *Import Restrictions on Trademarked Merchandise—The Role of the United States Bureau of Customs*, 59 T.M.R. 301 (1969). But nothing in the statute suggests that Congress conferred authority on the Bureau of Customs to condition its benefits on Customs' analysis of antitrust policy.

Equally questionable are the wisdom and necessity for such regulations. Antitrust questions are far too complex to be reasonably decided by reference to a short questionnaire on corporate ownership. The determinations made by Customs on this basis take no account, for example, of whether the similarly marked goods in fact compete with one another, or if so, what is the definition of the relevant market in which they compete.[10] The opinion of the district court in *Guerlain*, adopting the same theory as these regulations, has been roundly criticized, *see* Handler, *Trademarks—Assets or Liabilities?*, 48 T.M.R. 661 (1958); *Bell & Howell: Mamiya Co. v. Masel Sup-*

**9.** Defendants contend that facts not placed before Customs by plaintiff in its application for the exclusion order including Osawa-Japan's distributorship of Mamiya Co.'s products outside Japan and the substantially smaller size, as compared with Osawa-Japan's 30%, of the individual holdings constituting the other 70% of Mamiya Co.'s stock, would have led Customs to the conclusion of common control.

**10.** It is also most curious that the regulation denying exclusion of *genuine*-foreign-trademark goods based on the relationship between the U.S. and foreign markholder also denies exclusion of imports bearing *counterfeit* trademarks on the same basis. ("The restrictions set forth in paragraphs (*a*) [marks that copy or simulate] and (b) [genuine foreign marks] ... do not apply to imported articles when: [the foreign and domestic owners are ... related].") I cannot imagine what principle of antitrust law is served by withholding the exclusion of counterfeits by reason of relationships between the domestic and foreign markholder, especially in view of the fact that § 42 of the Lanham Act (the former § 27, providing for the exclusion of copying or simulating marks), unlike § 526, extends protection to foreign holders of U.S. marks (under certain circumstances) as well as to U.S. citizens and corporations.

*ply Co., supra,* 548 F.Supp. at 1077, and was, of course, disavowed by the Government when it changed its position on appeal and caused its own case to be dismissed with prejudice. But the district court in *Guerlain* at least considered the particular facts of the perfume industry before reaching its conclusion. The Customs regulations presume antitrust violation without reference to market considerations, from the sole fact of common control of foreign and domestic trademark owners. I consider this unsound both as antitrust policy and as trademark law. More significantly, these crude regulations denying rights granted by statute seem unnecessary to protect the interests they seek to guard. Although international business complexes might conceivably use trademarks and exclusion orders in a manner that violated the antitrust laws, ample remedies exist. These would include actions in the U.S. courts to void the exclusion order based on antitrust violation, treble damage actions, suits for unfair competition and defenses to infringement actions. *See Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 598–99, 71 S.Ct. 971, 974–75, 95 L.Ed. 1199 (1951); *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena,* 298 F.Supp. 1309, 1314 (S.D.N.Y.1969), *aff'd,* 433 F.2d 686 (2 Cir. 1970), *cert. denied,* 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971); 15 U.S.C.

§ 1115(b)(7). *See generally* Handler, *Trademarks—Assets or Liabilities?,* 48 T.M.R. 661 (1958).[11]

Defendants also argue that plaintiff's position would give plaintiff an unjustifiable monopoly on the U.S. sale of Mamiya equipment. This is simply not so. Nothing in this opinion would bar defendants from importing and selling the equipment manufactured by Mamiya Co. in Japan. What is forbidden is infringing on plaintiff's rights to the Mamiya marks. So long as defendants take steps so as not to infringe on plaintiff's trademark rights, nothing in the reasoning of this opinion would prevent them from dealing in the same equipment. Indeed it is noteworthy that one of the remedies provided in § 526(c) is the removal of the infringing trademark. *See Sturges v. Pease, supra.*

Defendants next contend that plaintiff is merely a licensee of the Mamiya marks and not the assignee of enforceable rights. This contention is based on the fact that a prior assignment in plaintiff's chain of title of two of the four marks included a restriction on alienation and a promise to reconvey under certain circumstances.[12] According to defendants' argument, that limitation, which devolved on plaintiff, is not compatible with ownership of enforceable rights. The argument is not compelling. First, it concerns only two of the four

---

11. Further developments in this action may require adjudication concerning these regulations. Defendants have sought to implead Customs to reverse its grant of the exclusion order under authority of the regulations. In response, plaintiff pleads to void the regulations. The present state of the record requires no adjudication. For the moment, it suffices to note, with respect to defendants' arguments, that others have questioned the lawfulness of the regulations, as well as their wisdom. *See Bell & Howell: Mamiya Corp. v. Masel,* 548 F.Supp. at 1078–79; Kuhn, *Remedies Available at Customs for Infringement of a Registered Trademark,* 70 T.M.R. 387, 394 (1980).

12. The assignment in question, in 1971 to Caprod, Ltd., a prior exclusive U.S. distributor of Mamiya goods, provided in part:

2. Assignee agrees that in the event of the termination of its present contract of exclusive distributorship, or any subsequent contract pursuant to which it is the exclusive

distributor of merchandise bearing the trademarks in question in the United States, or in the event that it fails to continue to guarantee, repair and replace such merchandise under such circumstances that the goodwill associated with the mark no longer identifies such goods as emanating from assignee, or assignee ceases to engage in the business in which it employs said trademarks, then, under those circumstances, assignee agrees that it will forthwith, and without expense to assignor, reassign said trademarks and any and all goodwill of the business connected therewith to the assignor.

3. Assignor further agrees that this assignment is personal to it and that it will not at any time assign to any third party the aforesaid trademarks or the goodwill of the business in connection with which they are employed, nor will assignee abandon use thereof without first giving notice of the intent to do so to assignor.

marks on which plaintiff sues. Second, retention of a reversionary interest by the transferor of a trademark does not preclude a determination that the ownership of the mark has been assigned. *See* 3 R. Callman, *The Law of Unfair Competition, Trademarks, and Monopolies*, § 19.46 at 201 (4 ed.1983); *In re George J. Ball, Inc.,* 153 U.S.P.Q. 426 (T.T.A.B.1967).

Defendants further argue that plaintiff lacks sufficient "indicia of trademark ownership", contending that Osawa-Japan did not pay Mamiya Co. for the trademark rights it acquired; that plaintiff has no freedom to choose the source from which it will purchase goods on which to affix the Mamiya marks; that plaintiff does not control the quality of Mamiya goods; and that the public does not identify plaintiff as the source of the goods. Defendants concede they have not "conclusively proved" that plaintiff "is not the 'owner' of the MAMI-YA marks." Brief of Defendant B & H Photo in Opposition to Plaintiff's Motion for a Preliminary Injunction at 35. These unproved contentions are insufficient to cast in doubt plaintiff's right to a preliminary injunction. As to public perception of the identity of the mark owner, defendants' argument misperceives the law. It is of little significance to the establishment of trademark rights whether the public can identify correctly by name the owner of the mark. Judge Learned Hand stated that enforceable rights would be found on a showing that the mark owner's

> use of the word ... has become enough associated with himself as to justify the

inference that buyers under that name are his customers. It is, of course, not necessary that he should be known as the maker; on the contrary, it will suffice if the article be known as coming from a single, though anonymous, source.

*Coty v. LeBlume, supra,* 292 F. at 267. What is significant is whether the public perceives the existence of a single commercial entity as the sponsor of the mark, not whether the public can accurately name that entity.[13]

\*   \*   \*

I conclude that plaintiff has made out its entitlement to preliminary relief under § 526, as well as for trademark infringement.

SO ORDERED.

### As Modified

Defendants move for reconsideration of the court's findings, both as to overall conclusions and as to eleven factual findings.

In general the motion protests the court's crediting the plaintiff's evidence over the versions argued by the defendants.

Only a few objections require comment.

1. The court's opinion described Osawa's sales policy (Opinion, page 6) as distributing only through dealers who will carry an adequate stock to supply the future needs of customers. Peterson had testified on this policy as a criterion for acceptance of applications for authorized dealerships.

---

**13.** To the extent that the recent opinions of the Ninth Circuit in *Anti-Monopoly, Inc. v. General Mills Fun Group*, 611 F.2d 296 (1979), 684 F.2d 1316 (1982), hold otherwise, I would decline to follow them. In the "Monopoly" case, that court ruled that a mark is generic, and unprotectable, unless its *"primary"* significance in the mind of the consumer is the producer rather than the product. Thus the famous board game trademark "Monopoly" was found generic because consumers associate the mark with the game more readily than with the producer of the game. By my perception, this reasoning would invalidate many if not most of the major American brands. Well-established trademarks that, like Monopoly, seem more likely to suggest

the product than the producer would include Anacin, Bufferin, Tylenol, Excedrin, Ivory, Dove, Oxydol, Comet, Ajax, Woolite, Joy, Lysol, Raid, Q-Tips, Coppertone, Ban, Modess, Kotex, Playtex, Digel, Pepto-Bismol, Crest, Aim, Pepsodent, Polident, Lavoris, Scope, Dentyne, Sanka, Visine, Old Spice, Trojan, Chevrolet, Cadillac, Lincoln, Mercury, Plymouth, Lucky Strike, and Winston, to name only a few. If the Ninth Circuit's view correctly states the law, to say the very least a major segment of the American merchandising industry and its lawyers have been operating under a drastically mistaken understanding. I believe Judge Hand's formulation quoted above correctly states the law.

Defendants argue that this finding was disproved by testimony of a former Osawa salesman Herman, a deposition in another action of a Osawa officer Duncan Kennedy, and instances of plaintiff's acceptance of small orders.

On reviewing defendants' contentions I acknowledge that my finding in the opinion was slightly overstated. It was the intent of this passage of the opinion to describe a *policy* to grant dealerships to dealers who would carry an adequate line of Mamiya stock. I did not mean to suggest that Osawa never honored a small opening order, particularly where it had reason to expect an active dealership. If the opinion can be read to imply more, it is hereby modified in accordance with this discussion.

As to defendants' contention, however, that even the existence of the policy was disproved by their evidence, I reject it.

As to the testimony of Herman, he made no secret of his hostility to the plaintiff, which had fired him. His testimony was full of resentment. I would be wary of accepting it. Furthermore, on the acceptance of small orders, a salesman's interests do not necessarily coincide with those of management.

Kennedy's deposition in the prior action can be read as contrary to Peterson's testimony since he did not mention the standards Peterson described. But such a reading would be unfair because Kennedy was not specifically asked about it. He did say that "no dealer who expressed an interest in purchasing the product *and had the ability to sell the product* would be refused." (Exh. 206, at 20–21, emphasis supplied.) What he might have said if asked the specific question is unclear.

2. Defendants also take issue with the statement (also on page 6) that Osawa conducts inspections on arrival of merchandise from abroad. Defendants point to Peterson's testimony that the frequency of testing varied with the sensitivity and historical defect rate of the parts in question and that the testing can be by batch or sample. This is not contrary to the statement in the opinion that inspections are made. The

opinion does not purport to find that every piece is inspected.

Again, defendant attempts to impeach Peterson's testimony by testimony of Duncan Kennedy taken in 1981 in another action. The impeachment is ineffective for the same reason as discussed on the previous point. Kennedy described certain relabelling and changes in packaging and said that was all that was done. Defendants contend this should be taken as proving that no inspection occurs. But Kennedy was not asked whether any inspecting is done. It would be unfair to read his testimony as denying inspections. Nothing prevents defendants from questioning Kennedy or other knowledgeable employees and asking the questions explicitly.

Defendants also point to Osawa circulars to dealers referring to shipment in "factory sealed cartons" (Exhs. 19, 20), arguing that this is incompatible with inspection on importation. No doubt this evidence raises questions. It does not, however, justify a finding that Peterson either was lying or misinformed.

[On the related issue whether defendants inspect, I note that Mr. Beilush testified that Tri-State never opened the boxes. (Beilush dep. pages 107–108.)]

3. Defendants challenge the finding that plaintiff offers free warranty repairs, and that this constitutes an expense not borne by defendants. Defendants argue that these conclusions are undermined by a contract that entitles Osawa to bill Mamiya at a specified hourly rate for warranty work. First, it is not clear that this obligation, if paid, would fully cover Osawa's costs. But in any event, plaintiff offered proof that the obligation had not been met by Mamiya for several years.

4. Defendant argues that the reversals in plaintiff's business were attributable to causes other than the defendants' grey marketing. The opinion acknowledges that no single explanation is sufficient and that some of defendants' arguments had a measure of validity. Notwithstanding other contributing causes, plaintiff suffers ir-

reparable harm by reason of grey marketing activity.

5. Counsel takes strident exception to various findings, including that grey markets operate on "the fringes of legality" using secrecy and scanty informal records. Those observations pertained to the inadequacy of an accounting remedy. To the obvious points and those made in the Opinion, I would add that Goldstein testified (dep. 142–43) that B & H trades equipment with other dealers without making or keeping any records, and Beilush testified (dep. 31–36) to the practice of advertising merchandise that was not in stock with the expectation of either picking up the merchandise by exchange or switching the customer to different merchandise.

6. Tri-State contends it should not have been found to have imported Mamiya equipment, *see* Opinion, footnote at page 7, inasmuch as it, unlike B & H Photo, had disclosed its sources to the court in the course of the hearing. Plaintiff contests this assertion. The resolution of the issue is unclear. I modify the May 24 opinion by deleting the last sentence of the footnote at page 1166, leaving the question open.

This change has no effect on any other conclusions reached in the opinion.

\* \* \* \* \* \*

Defendants' other contentions do not require discussion. They simply protest the court's acceptance of plaintiff's evidence rather than defendants'. Except to the extent noted above, the motion for reconsideration of the findings is denied.*

More significant, however, is another point raised in defendants' brief and correspondence. Defendants contend that after full discovery they will succeed in rebutting plaintiff's proofs as to plaintiff's development of a domestic goodwill. They ask that the issuance of the preliminary injunction be withheld until they have had full opportunity for discovery and presentation of evidence upon final trial. Counsel appears to undertake that defendants will not deal in grey Mamiya merchandise pending final trial. He asserts that defendants' prior dealing in grey merchandise was in the belief that this did not violate the laws, and that defendants will be governed by this court's ruling, pending final trial.

If this is indeed the defendants' undertaking, it has considerable force. Preliminary injunctions are granted on an incomplete record only for the purpose of preventing irreparable harm. Since preliminary injunction hearings are held on relatively short notice after less than full discovery, the findings are merely provisional, subject to retraction or change after full discovery and trial. As the Court of Appeals emphasized in the *Masel* action, such provisional injunctions are awarded only to prevent irreparable harm.

If plaintiff can be assured that defendants will not deal in grey Mamiya equipment during the pendency of the trial, plaintiff would not be threatened with irreparable harm and there would be neither need nor justification for an injunction based on an incomplete record. Since 90% of the defendants' business is by mail order from advertisements, plaintiff should have no difficulty monitoring any possibility of violation of such an undertaking. As a practical matter, it would seem defendants cannot deal in grey goods without advertising, and defendants cannot advertise without plaintiff being aware of it.

The record, however, is not altogether clear as to whether counsel's statements constitute an undertaking by defendants. If that is defendants' position, they should promptly file an explicit undertaking to the effect that they will not deal in grey Mamiya equipment pending final trial on the merits.

SO ORDERED.

---

* I regret counsel's claims that the court's findings resulted from hostility and prejudice. I assume this merely reflects his disappointment at the loss of a vigorously contested proceeding. I think no further comment is required.