COALITION TO PRESERVE THE INTEGRITY OF AMERICAN TRADEMARKS, et al., Appellants,

v.

UNITED STATES of America, et al., Appellees.

No. 84–5890.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 22, 1986.

Decided May 6, 1986.

William H. Allen, with whom Eugene A. Ludwig, Scott D. Gilbert, Daniel A. Rowley and Elizabeth V. Foote, Washington, D.C., were on brief, for appellants.

David M. Cohen, Director, Commercial Litigation Branch, Civil Div., Dept. of Justice, with whom Richard K. Willard, Acting Asst. Atty. Gen. and Velta A. Melnbrencis, Dept. of Justice, Washington, D.C., were on brief, for appellee U.S.

Nathan Lewin, with whom Jamie S. Gorelick, Washington, D.C., was on brief, for appellee 47th Street Photo, Inc.

Robert E. Hebda, with whom Robert W. Steele, Washington, D.C., and James C. Tuttle, Troy, Mich., were on brief, for appellee K–Mart Corp.

Frank W. Gaines, Jr. and Robert L. Hoegle, New York City, were on brief, for

amicus curiae Progress Trading Co., Inc., urging affirmance.

Bernard Fensterwald, III, Arlington, Va. and Robert Ullman, New York City, were on brief, for amicus curiae American Free Trade Ass'n, urging affirmance.

Before MIKVA, BORK and SILBERMAN, Circuit Judges.

SILBERMAN, Circuit Judge:

This case concerns the validity of regulations issued by the U.S. Customs Service permitting the importation of so-called "grey-market goods" in certain instances. These are goods manufactured abroad bearing legitimate foreign trademarks that are identical to American trademarks. This situation typically arises when a foreign producer creates an American subsidiary that then registers the American trademark. Both the foreign producer and its American subsidiary often wish distribution in the United States to be exclusively controlled by the American subsidiary. If, however, the price at which the American subsidiary sells the goods exceeds the price at which the goods are sold abroad, other importers have an obvious incentive to purchase the goods abroad (typically from a third-party who has legitimately purchased directly from the foreign producer) and resell them in the United States—perhaps without certain associated services or warranties—at a price below that charged by the American subsidiary. The same result can occur, however, if the American trademark owner is the parent and the goods are manufactured abroad by a foreign subsidiary.

The appellants are the Coalition to Preserve the Integrity of American Trademarks (COPIAT), a trade association of United States companies that own American trademarks, and two of its members, Cartier, Inc. and Charles of the Ritz Group Ltd. They urge that importation of goods bearing trademarks identical to their own is barred by two statutory provisions, Section 526 of the Tariff Act of 1930, 19 U.S.C. § 1526 (1982), and Section 42 of the Lanham Trade-Mark Act of 1946, 15 U.S.C. § 1124 (1982). Customs regulations implementing these statutes permit the importation of such goods, *inter alia,* if the American and foreign trademarks are owned by the same or affiliated entities or if the American trademark owner has authorized the foreign entity to use the trademark. 19 C.F.R. § 133.21(c)(1)–(3) (1985). The individual corporate appellants and, apparently, many of COPIAT's other members fall within these categories of trademark owners exempted from protection against imports.

The appellants brought suit below against the Commissioner of Customs, the Secretary of the Treasury, and the United States, seeking a declaration that the regulations are invalid because inconsistent with the two statutes and an injunction prohibiting their enforcement and compelling enforcement of the express terms of the statutes. Two retailers who deal in grey-market goods, 47th Street Photo, Inc. and K-Mart Corporation, intervened as defendants. The district court initially determined that it had jurisdiction to adjudicate the claims presented, rejecting 47th Street Photo's argument that the United States Court of International Trade had exclusive jurisdiction over the action's subject matter. *Coalition to Preserve the Integrity of American Trademarks v. United States,* 598 F.Supp. 844, 847 (D.D.C.1984). On cross-motions for summary judgment and a motion to dismiss, the district court then upheld the Customs regulations, holding that they were a "sufficiently reasonable" interpretation of the governing statutes, "supported by legislative history, judicial decisions, legislative acquiescence, and the long-standing consistent policy of the Customs Service." *Id.* at 852.

The issues raised in this case are matters of first impression in this Circuit, and, moreover, have engendered considerable disagreement among the courts considering them to date. The district court's holding on the issue of its jurisdiction conflicts with

that of the Federal Circuit in *Vivitar Corp. v. United States,* 761 F.2d 1552 (Fed.Cir. 1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986). Its views on the validity of the Customs regulations are in accord with those expressed in *Olympus Corp. v. United States,* 627 F.Supp. 911 (E.D.N.Y.1985), *appeal docketed,* No. 85–6282 (2d Cir.Sept. 27, 1985); *Vivitar Corp. v. United States,* 593 F.Supp. 420 (Ct. Int'l Trade 1984), *aff'd on other grounds,* 761 F.2d 1552 (Fed.Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986); and *Parfums Stern, Inc. v. Customs Serv.,* 575 F.Supp. 416 (S.D.Fla.1983), but in conflict with those expressed in *Osawa & Co. v. B & H Photo,* 589 F.Supp. 1163 (S.D.N.Y.1984) and *Bell & Howell: Mamiya & Co. v. Masel Supply Co.,* 548 F.Supp. 1063 (E.D.N.Y.1982), *vacated on other grounds,* 719 F.2d 42 (2d Cir.1983). For the reasons stated herein, we conclude that the district court correctly held that it possessed jurisdiction over this action. We hold, however, that the district court erred in upholding the regulations, and that the appellants are entitled to a declaratory judgment that the regulations violate Section 526. Accordingly, we reverse the judgment of the district court.

## I. JURISDICTION

At the outset, we are faced with a challenge to the jurisdiction of the district court and thus this court.[1] The issue is whether actions of this sort may properly be brought in federal district court or whether they must in all cases be initiated in the Court of International Trade, with appellate jurisdiction in the Federal Circuit. In a recent case, the Federal Circuit held that by virtue of a provision of the Customs Courts Act of 1980, 28 U.S.C. § 1581 (1982), the Court of International Trade has exclusive jurisdiction over claims based upon Section 526. *Vivitar Corp. v. United States,* 761 F.2d 1552 (Fed.Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986).

Absent that enactment there could be no doubt of the district court's power to adjudicate this action under the grant of general federal-question jurisdiction, 28 U.S.C. § 1331 (1982), and under the grant of jurisdiction for actions "arising under any Act of Congress relating to patents, ... copyrights and trade-marks." 28 U.S.C. § 1338(a) (1982). Jurisdiction over the Section 42 claim is also conferred by the Lanham Act's jurisdictional provision, 15 U.S.C. § 1121 (1982). Because the Customs Courts Act did not create any new substantive law, but merely provided for exclusive jurisdiction over certain categories of cases in the Customs Court (the predecessor of the Court of International Trade), it follows that the Act divests the district courts of some of their preexisting jurisdiction. *See Vivitar,* 761 F.2d at 1559–60. Specifically, it would seem that the district courts are without jurisdiction over any of the cases enumerated in 28 U.S.C. § 1581.[2]

---

**1.** 47th Street Photo is the only party who argues that this court lacks jurisdiction.

**2.** 28 U.S.C. § 1581 provides, *inter alia:*

> (a) The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or in part, under section 515 of the Tariff Act of 1930.
>
> . . . .
>
> (i) In addition to the jurisdiction conferred upon the Court of International Trade by subsections (a)–(h) of this section ... the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for—

> (1) revenue from imports or tonnage;
>
> (2) tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue;
>
> (3) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety; or
>
> (4) administration and enforcement with respect to the matters referred to in paragraphs (1)–(3) of this subsection and subsections (a)–(h) of this section.

The parties appear to agree that the district court would have jurisdiction over the Lanham Act (Section 42) claim even if that claim fell within one of the categories listed in 28 U.S.C. § 1581. We fail to see why that would be so: if the Customs Courts Act implicitly modifies 28

The Federal Circuit in *Vivitar* held that two subsections of 28 U.S.C. § 1581 apply to an American trademark owner's challenge to the Customs regulations in question. First, it maintained that the Court of International Trade has exclusive jurisdiction over such actions "as a corollary to protest jurisdiction under 28 U.S.C. § 1581(a)." *Vivitar*, 761 F.2d at 1560. Under 28 U.S.C. § 1581(a), the Court of International Trade has exclusive jurisdiction over challenges to Customs' denial of "protests" filed under Section 515 of the Tariff Act of 1930, 19 U.S.C. § 1515 (1982). Protests are administrative complaints available to importers challenging certain actions by Customs, including "the exclusion of merchandise from entry or delivery under any provision of the customs laws." 19 U.S.C. § 1514(a)(4) (1982). The case before the *Vivitar* court concerned an American trademark owner's challenge to Customs' decision *not* to exclude the merchandise in question, and there is no provision for administrative protests by such interested third-parties. Nevertheless, the Federal Circuit maintained that the case involved a *subject matter* that would have given rise to a protest (by the importer), if the goods had been excluded rather than admitted.[3] It then concluded that the case fell within 28 U.S.C. § 1581(i)(4), which creates jurisdiction over actions against federal agencies arising under laws of the United States providing for "administration and enforcement with respect to the matters referred to in ... subsections (a)–(h) of this section." The court reasoned that a challenge to Customs regulations permitting importation of the goods at issue implicated "administration and enforcement" of the "matter"—*i.e.*, a protestable subject matter—referred to in 28 U.S.C. § 1581(a); it viewed 28 U.S.C. § 1581(i)(4) as providing a "residual" basis for jurisdiction over cases not literally covered by 28 U.S.C. § 1581(a). *See Vivitar*, 761 F.2d at 1557–60.

We are of the opinion that the language of 28 U.S.C. § 1581(a) and (i)(4) will not bear the Federal Circuit's construction. We think, rather, that a sound reading indicates that the "matter[] referred to" in Section 1581(a) is the denial of protests, or simply protests. Because no right to protest arises from Customs' admission of goods—in contrast to its exclusion of goods—in such cases there is no administration and enforcement of this "matter" (protests). The Federal Circuit apparently felt that this straightforward construction of the statute would render Section 1581(i)(4) duplicative of Section 1581(a). *See Vivitar*, 761 F.2d at 1559. We disagree: whereas Section 1581(a) only provides for jurisdiction over cases contesting the denial of a protest—in other words, challenging the basis of the denial—Section 1581(i)(4) (as applied to Section 1581(a)) provides additional jurisdiction over cases challenging the *procedures*—that is, the "administration and enforcement"—generally governing such protests.

The Federal Circuit alternatively held that the Court of International Trade had jurisdiction under 28 U.S.C. § 1581(i)(3), which relates to actions against federal agencies arising under any law of the United States providing for "embargoes or other quantitative restrictions on the importation of merchandise ...." *See Vivitar*, 761 F.2d at 1559–60. Again, we must respectfully disagree with the Federal Cir-

---

U.S.C. § 1331 and 28 U.S.C. § 1338(a) by vesting exclusive jurisdiction over specified cases in the Court of International Trade, then it ought to follow that it modifies the Lanham Act's jurisdictional provision, 15 U.S.C. § 1121, as well. We need not decide this issue, however, because we conclude that neither of the appellants' claims falls within the categories of cases listed in 28 U.S.C. § 1581.

**3.** The Government argues that a protest would not be available to an importer challenging an exclusion of goods under Section 526 because it

is a trademark law, not a "customs law" and, therefore, the Court of International Trade and the Federal Circuit have no jurisdiction over cases arising under that Section. We believe, however, that *even if* 28 U.S.C. § 1581 covers the case of an importer's challenge to Customs' exclusion of goods under Section 526, it does not extend to a third-party's challenge to Customs' admission of goods. Thus, it is unnecessary for us to pass on this arcane point of Customs procedure.

cuit's view. Although Section 526 undoubtedly prevents certain goods from entering the country (those with trademarks identical to American trademarks), we think it is not an "embargo" contemplated by 28 U.S.C. § 1581(i)(3). The other categories of cases enumerated in 28 U.S.C. § 1581(i) all specifically deal with traditional Customs matters (and thus lie within the Court of International Trade's expertise): cases arising under laws providing for "revenue from imports or tonnage," 28 U.S.C. § 1581(i)(1), or for "tariffs, duties, fees, or other taxes on the importation of merchandise ...," *id.* § 1581(i)(2). Thus, the structure of the statute belies any expansive reading of the term "embargo." Rather, it indicates that Section 1581(i)(3) only extends to quotas and embargoes arising out of trade policy, the sort of measures that have traditionally limited the importation of shoes, textiles, automobiles, and the like. Whereas subsection (i)(2) covers restrictive measures aimed at the *price* of imports (tariffs, duties, etc.), subsection (i)(3) covers restrictions on the *quantity* of imports.

In sum, we conclude that this action does not fall within any of the specific provisions of 28 U.S.C. § 1581. We find nothing in the purpose or legislative history of 28 U.S.C. § 1581 justifying a departure from its literal terms. Congress' overriding purpose was to consolidate jurisdiction over certain matters involving international trade in a single specialized court, bringing uniformity and expertise to the area. But those ends would not be served in this case. Regardless of which court takes jurisdiction over actions commenced against the Government, the district courts would still have jurisdiction over actions under Section 526(c) against private parties. 28 U.S.C. § 1581 being no bar, we hold that the district court properly exercised jurisdiction over this action under 28 U.S.C. § 1331, 28 U.S.C. § 1338(a), and 15 U.S.C. § 1121.

## II. THE VALIDITY OF THE REGULATIONS

■ We turn, then, to the appellants' challenge to the Customs Service's failure to exclude all grey-market goods. The appellants claim that the Customs regulations permitting the importation of such goods where the American and foreign trademarks are owned by the same or related entities, or where the American trademark owner has authorized the use of the trademark, *see* 19 C.F.R. § 133.21(c)(1)–(3) (1985), are contrary to the statutes they purport to implement, Section 526 of the Tariff Act of 1930 and Section 42 of the Lanham Trade-Mark Act of 1946. We conclude that the regulations simply cannot be squared with Section 526 and are thus invalid. In light of this holding, it is unnecessary to decide whether the regulations would be consistent with Section 42 standing alone.

Section 526(a) provides:

Except as provided in subsection (d) of this section, it shall be unlawful to import into the United States any merchandise of foreign manufacture if such merchandise, or the label, sign, print, package, wrapper, or receptacle, bears a trademark owned by a citizen of, or by a corporation or association created or organized within, the United States, and registered in the Patent and Trademark Office by a person domiciled in the United States, ... and if a copy of the certificate of registration of such trademark is filed with the Secretary of the Treasury, ... unless written consent of the owner of such trademark is produced at the time of making entry.

19 U.S.C. § 1526(a) (1982).[4]

Section 526 does not, on its face, admit of any exceptions based upon the relationship

---

**4.** The remainder of Section 526 provides, *inter alia*:

(b) Any such merchandise imported into the United States in violation of the provisions of this section shall be subject to seizure and forfeiture for violation of the customs laws.

(c) Any person dealing in any such merchandise may be enjoined from dealing therein within the United States or may be required to export or destroy such merchandise or to remove or obliterate such trademark and shall be liable for the same damages and

of the American and foreign trademark owners or upon whether the American owner has authorized the use of the trademark abroad. Nevertheless, the appellees maintain, and the district court held, that the Customs regulations must be upheld as a reasonable interpretation of the statute by the agency charged with its enforcement. We think, however, that the district court misapprehended the doctrine of deference to an agency interpretation of its governing statute. That doctrine only comes into play when it is apparent that "Congress has not directly addressed the precise question at issue." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *see Federal Election Comm'n v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 31–32, 102 S.Ct. 38, 41–42, 70 L.Ed.2d 23 (1981). "If the intent of Congress is clear, that is the end of the matter . . . ." *Chevron,* 467 U.S. at 842, 104 S.Ct. at 2781.[5] Thus, courts must exercise their independent judgment on the preliminary question of whether a statute unambiguously expresses congressional intent on the matter at issue; deference to an agency's interpretation becomes appropriate where the statute delegates authority to an agency to give content to flexible statutory terms or contains "gaps" that invite an agency role in interpretation. *See id.* at 843–44, 104 S.Ct. at 2782–83; *Federal Election Comm'n,* 454 U.S. at 31–32, 102 S.Ct. at

41–42; *Morton v. Ruiz,* 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 380–81, 385–86, 89 S.Ct. 1794, 1801, 1804, 23 L.Ed.2d 371 (1969).[6]

In this case, we believe that Congress' intent in Section 526 is clear, and thus "that is the end of the matter." *See infra* Part II.A. Alternatively, we hold that the Customs regulations are invalid because they do not constitute a reasonable interpretation of Section 526. *See infra* p. 916.

### A. The Purpose of Section 526

The broad protection afforded American trademark owners by Section 526 literally covers the appellants' situation. The appellees contend, however, that this court ought not be enticed by what they regard as the discredited "plain meaning" rule—that is, the traditional canon of statutory construction that precludes resort to extrinsic indicia of legislative intent if the language of a statute is unambiguous and fidelity to its literal terms will not produce an absurd result. It is not as clear as the appellees suggest that this canon of interpretation has been discredited. *See, e.g., Garcia v. United States,* 469 U.S. 70, 105 S.Ct. 479, 482–83, 83 L.Ed.2d 472 (1984); *TVA v. Hill,* 437 U.S. 153, 184 n. 29, 98 S.Ct. 2279, 2296 n. 29, 57 L.Ed.2d 117 (1978); *Eagle-Picher Indus., Inc. v. EPA,* 759 F.2d 922, 929–30 & n. 11 (D.C.Cir.

profits provided for wrongful use of a trademark [under the Lanham Act].

(d)(1) The trademark provisions of this section and [Section 42 of the Lanham Act] do not apply to the importation of articles accompanying any person arriving in the United States when such articles are for his personal use and not for sale if (A) such articles are within the limits of types and quantities determined by the Secretary . . . .

19 U.S.C. § 1526(b)–(d) (1982).

**5.** In *Chevron,* the Supreme Court put to rest whatever uncertainty may have existed over the respective provinces of courts and administrative agencies in interpreting regulatory statutes:

The judiciary is the final authority on issues of statutory construction and must reject ad-

ministrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect. 467 U.S. at 843 n. 9, 104 S.Ct. at 2782 n. 9 (citations omitted).

**6.** "[P]roperly understood, deference to an agency's interpretation constitutes a *judicial* determination that Congress has delegated the norm-elaboration function to the agency and that the interpretation falls within the scope of that delegation." *Montana v. Clark,* 749 F.2d 740, 745 (D.C.Cir.1984), *cert. denied,* ⸺ U.S. ⸺, 106 S.Ct. 246, 88 L.Ed.2d 255 (1985) (citations omitted; emphasis in original).

1985).[7] In any event, this case does not compel us to choose between the "plain meaning" of a statute and extrinsic indicia of intent: our review of the circumstances prompting the enactment of Section 526 and its legislative history persuade us that the statute embodies a purpose as sweeping as the terms its drafters employed.

*1. Background.*—The broad scope of Section 526 can best be understood in light of the fundamental changes in thinking about trademark protection taking place during the period of its inception. The Second Circuit's decision in *A. Bourjois & Co. v. Katzel,* 275 F. 539 (2d Cir.1921), a major stimulus for the enactment of Section 526, restated the prevailing law on the subject.[8] In that case, the plaintiff, an American company, had purchased the United States trademark rights of a French firm whose face powder it imported and distributed. The defendant, a retail druggist, purchased the French firm's face powder abroad and imported and sold it in competition with the American trademark owner. The Second Circuit reversed an injunction issued against such competition. The Court reasoned that trademarks, unlike patents, do not confer any monopoly upon their owner; they merely indicate "the origin of the goods they mark, so that the owner and the public may be protected against the sale of one man's goods as the goods of another man." *Id.* at 543. "If the goods sold are the genuine goods covered by the trade-mark, the rights of the owner of the trade-mark are not infringed." *Id.* The dissenting judge observed in response: "It is not yet settled whether a trade-mark is to be primarily regarded as protecting the trade-mark owner's business from a species of unfair competition, or protecting the public from imitations. The decision in this case seems to me to lean the wrong way ...." *Id.*

Congress passed Section 526 as an amendment to the Tariff Act of 1922 (which was before it at the time) while review of the Second Circuit's *Katzel* decision was pending in the Supreme Court. The Supreme Court subsequently reversed the Second Circuit's decision without mentioning Section 526, which was not at issue in the case.[9] Writing for the Court, Justice Holmes emphasized that trademark law secures property rights as well as safeguarding the public from deception; he analogized the law's protection of trademarks to that afforded patented articles:

> If the goods were patented in the United States a dealer who lawfully bought similar goods abroad from one who had a right to make and sell them there could not sell them in the United States. The monopoly in that case is more extensive, but we see no sufficient reason for holding that the monopoly of a trade mark, so far as it goes, is less complete.

*A. Bourjois & Co. v. Katzel,* 260 U.S. 689, 692, 43 S.Ct. 244, 245, 67 L.Ed. 494 (1923) (citations omitted).

Justice Holmes' opinion adopted what has come to be called the "territoriality" theory of trademark. This approach maintains that the source and scope of trademark protection arise from the law of a *particular* sovereign state, and thus that it is meaningless to discuss the "genuineness" of a trademark in the abstract. *See*

---

**7.** Of course, even under the "plain meaning" rule a court may consult legislative history and other sources if it is contended that application of the literal terms of a statute will lead to an absurd result. *See TVA v. Hill,* 437 U.S. 153, 184 n. 29, 98 S.Ct. 2279, 2296 n. 29, 57 L.Ed.2d 117 (1978). Thus, in practice it may be that the rule will rarely preclude resort to extrinsic indicia of intent.

**8.** *Katzel* was an infringement suit brought against a private party. It followed the reasoning of cases arising under Section 27 of the Trade-Mark Act of 1905 (the predecessor to Section 42 of the Lanham Act) that had rejected the claims of American trademark owners that Customs ought to exclude goods bearing genuine foreign trademarks identical to American trademarks. *See, e.g., Fred Gretsch Mfg. Co. v. Schoening,* 238 F. 780 (2d Cir.1916).

**9.** Section 526 provides for remedies against private parties as well, *see* 19 U.S.C. § 1526(c), but the statute was not available to the plaintiff in *Katzel* at the time it brought suit and presumably it was thought that the subsequent enactment could not affect the case on appeal.

Note, *The Greying of American Trademarks: The Genuine Goods Exclusion Act and the Incongruity of Customs Regulation 19 C.F.R. § 133.21*, 54 Fordham L.Rev. 83, 106–109 (1986). Justice Holmes wrote:

> It is said that the trade mark here is that of the French house and truly indicates the origin of the goods. But that is not accurate. It is the trade mark of the plaintiff only in the United States and indicates in law ... that the goods come from the plaintiff although not made by it.

260 U.S. at 692, 43 S.Ct. at 245.[10]

*2. Legislative History.*—In enacting Section 526, Congress did not have the benefit of Justice Holmes' lucid, if characteristically terse, opinion in *Katzel.* Yet it is clear that Congress similarly rejected without qualification the legal theory underlying the Second Circuit's opinion in *Katzel*—the view that a trademark genuine in a foreign country is necessarily genuine here as well—and enshrined the alternative "territoriality" approach into law. Thus, the Conference Report accompanying the Tariff Act noted:

> A recent decision of the circuit court of appeals holds that existing law does not prevent the importation of merchandise bearing the same trade-mark as merchandise of the United States, if the imported merchandise is genuine and if there is no fraud upon the public. [Section 526] makes such importation unlawful without the consent of the owner of the American trade-mark ....

H.R.Rep. No. 1223, 67th Cong., 2d Sess. 158 (1922). The report's reference to *Katzel* mistakenly identifies it as an import exclusion case rather than an infringement case; more important, however, is the report's reflection of Congress' sweeping rejection of prevailing legal doctrine.

The appellees argue that statements made during the ten-minute Senate debate on Section 526 show that that body was primarily concerned with the specific factual scenario presented in *Katzel* (or its misperception of the facts of *Katzel*). The appellees would have us extrapolate from this that Congress did not intend Section 526 to bar importation of goods bearing an American trademark where the American trademark owner is not "independent" of the foreign trademark owner. Of course, isolated remarks made during a floor debate are less authoritative sources of congressional intent than are committee reports, *Garcia v. United States*, 469 U.S. 70, 105 S.Ct. 479, 483, 83 L.Ed.2d 472 (1984); *United States v. O'Brien*, 391 U.S. 367, 385, 88 S.Ct. 1673, 1683, 20 L.Ed.2d 672 (1968), and in particular conference reports. *Cf. Eagle-Picher Indus., Inc. v. EPA*, 759 F.2d 922, 929 n. 10 (1985).

In any event, however, we think the Senate debate, considered as a whole, reinforces our conclusion that Section 526 confers an absolute, unqualified property right upon American companies that own registered trademarks. Despite the briefness of the debate (the proponents apparently had the votes), opponents raised sharp and passionate objections to the broad property rights granted. For example, Senator Mo-

---

**10.** Subsequently, in *A. Bourjois & Co. v. Aldridge*, 263 U.S. 675, 44 S.Ct. 4, 68 L.Ed. 501 (1923) (per curiam), a case with facts similar to those of *Katzel*, the Supreme Court held that goods bearing genuine foreign trademarks identical to American trademarks should be excluded from the country by the Customs Service under Section 27 of the Trade-Mark Act of 1905 (the predecessor to Section 42 of the Lanham Act), which barred the entry of goods that "copy or simulate" a registered trademark.

The appellees note that Holmes' opinion in *Katzel* (upon which *Aldridge* relied) emphasized that the plaintiff had expended considerable sums in advertising the French firm's powder,

so that "the labels have come to be understood by the public here as meaning goods coming from the plaintiff." 260 U.S. at 691, 43 S.Ct. at 245. Thus, it is argued, *Katzel* and *Aldridge* suggest that a plaintiff must demonstrate the existence of independent domestic goodwill before he may prevail on a claim that goods bearing an identical but genuine trademark infringe his trademark, and likewise before he may demand that such goods be excluded from importation under Section 42. Whether or not such a limitation on the scope of protection afforded by Section 42 is inferrable from *Katzel*—a matter we do not decide—it is plain that no such restrictions limit the reach of Section 526.

ses declared that Section 526 "constitutes but another diamond-studded link in the chain with which the Committee on Finance seems bound to adorn the buxom bosom of certain interests in this country." 62 Cong. Rec. 11,602 (1922). Conversely, Senator McCumber, a co-sponsor of Section 526, emphasized the need to reform existing trademark doctrine, which he criticized as "stating that the trade-mark is simply to indicate the character of the goods, or the maker, so that we will know what the goods are; and the courts will not protect the individual [trademark owner]." *Id.* at 11,605. Among the "individuals" that Congress appears specifically to have sought to protect were Americans who purchased the U.S. trademark rights of such well-known products as Bayer aspirin from the Government's Alien Property Custodian (who held the American assets of German companies seized during the First World War). *See id.* at 11,604 (remarks of Sen. McCumber); *id.* (remarks of Sen. Simmons).

Admittedly, Senator McCumber incorrectly described *Katzel* as a case where the firm that sold its American trademark rights to the plaintiff thereafter *itself* marketed identically-trademarked goods in the United States. *Id.* at 11,605. And Senator Sutherland declared: "[A]ll that [Section 526] does is to prevent fraud, and I believe that the Senate is in favor of protecting the property rights of American citizens who have purchased trade-marks from foreigners, and [sic] when these foreigners deliberately violate the property rights of those to whom they have sold these trade-marks by shipping over to this country goods under those identical trademarks." *Id.* at 11,603. In context, however, such statements are best understood as efforts by proponents of a bill to understate its significance by focusing on its most notorious targets. Shortly after Senator Sutherland's assertion that the measure would only "prevent fraud," an opponent, Senator Lenroot, raised a number of questions about the scope of Section 526. He first suggested a hypothetical case of an American citizen purchasing a sack of American-made Won-

der flour in Toronto and then seeking to return home with it. *Id.* at 11,603. As he read the provision, crossing the border with the sack of Wonder flour would be illegal. Senator Sutherland answered, "And it ought to be," *id.* at 11,603, which clearly suggests that his previous statement concerning "fraud" must be taken with a grain of salt.

In any event, others apparently thought this result too harsh on the hypothetical purchaser of Wonder flour. Senator McCumber suggested, and the body agreed, that the proposed version of Section 526 be amended to its present form to cover only goods "of foreign manufacture." *Id.* at 11,603–04. Importantly, he did *not* answer Senator Lenroot's hypothetical case by simply noting (as the Customs Service would under its regulations) that the owners of the American and Canadian trademarks were the same company, or that the American trademark owner had authorized the use of the trademark.

Later in the debate, a scenario quite like the facts of the instant case was discussed. Senator McCumber was asked whether Section 526 would preclude competition with an American firm that acquired an exclusive distributorship of a foreign trademarked article, Pears' soap. *Id.* at 11,605. Senator McCumber responded that Section 526 would not have that effect because only registered trademarks owned by American domiciliaries were protected by it. *Id.* In fact, Senator McCumber was mistaken; the original version of Section 526 required that the trademark be registered by an American domiciliary, but did not require that it be *owned* by an American citizen or corporation. The House subsequently discovered this omission, and the conferees amended Section 526 to add such a requirement. H.R.Rep. No. 1223, 67th Cong., 2d Sess. 158 (1922).

Senator McCumber's response, however, did not satisfy Senator Lenroot, who was concerned that foreign corporations could obtain the statutory monopoly simply by incorporating an American subsidiary. In the debate's final colloquy, Senator Lenroot

pressed Senator McCumber on this point. To be sure, Senator McCumber's answer, whether designedly or not, was not a model of clarity:

> SEN. LENROOT: We will assume that Pears' soap ... is not registered in the United States. It is sold in the general markets throughout the world, but the makers of Pears' soap desire a monopoly in the United States. They have American agents who register a trade-mark of Pears' soap here in the United States. I want to inquire whether any American could purchase Pears' soap abroad and import it without the written consent of their agent here in the United States, and if not, why not? . . . .

> SEN. McCUMBER: [I]f there has been no transfer of trade-mark, that presents an entirely different question. But suppose the trade-mark is owned exclusively by an American firm or corporation. The mere fact of a foreigner having a trade-mark and registering that trade-mark in the United States, and selling the goods in the United States through an agency, of course, would not be affected by this provision.

> SEN. LENROOT: This is an international trade-mark of Pears' soap, registered here by an American, with American domicile. Under it Pears' soap could not be bought in the markets of the world and sold here without the written consent of the Pears' soap company, or their agent domiciled here in America.

62 Cong.Rec. 11,605 (1922). At this point, time ran out on the debate, and so despite his doggedness Senator Lenroot never got an acceptable answer to his question.

Thus, the debate does not unequivocally resolve all questions about the scope of Section 526. Nevertheless, we think that the appropriate inference to be drawn is that Senator Lenroot was correct in fearing that the statute meant exactly what it said. We recognize that just as a proponent of a

bill may tend to downplay its significance, an opponent may be prone to exaggerate its repercussions. But no Senator suggested that Senator Lenroot's reading of the statute was unwarranted. To the contrary, two amendments to Section 526 were made to respond to specific hypothetical cases that he raised: first, the Senate added the limitation that only foreign-made goods were covered; second, the House added the requirement that only American companies were entitled to the protections of the statute. Senator Lenroot explicitly raised the issue of an American subsidiary of a foreign company, but the conferees did not further amend the statute. The reasonable inference to be drawn from all this is that the lawmakers consciously drew the line at American companies, and did not adopt distinctions among different categories of American companies.[11]

*3. The 1930 Reenactment.*—In 1930, the statute was repealed and reenacted in identical form, becoming Section 526 of the Tariff Act of 1930. The reenactment followed an unsuccessful effort to amend the statute by deleting the clause permitting an American trademark owner to consent to the admission of goods bearing its trademark into the country. That effort was designed to protect American jobs by preventing U.S. manufacturers from establishing foreign-based plants. *See* S.Rep. No. 37, 71st Cong., 1st Sess. 75 (1929) ("[W]here the laws of the United States protect the interest of a trade-mark holder by allowing him a monopoly in the use of the mark, it is reasonable to require, so far as practicable, that, in return, the holder of the trade-mark shall manufacture his goods in the United States."). Although this amendment did pass the Senate, it was rejected by the House and abandoned in conference. 72 Cong.Rec. 7870 (1930). This failed amendment further demonstrates Congress' understanding that Section 526 absolutely barred importation of

---

**11.** The appellants point out that in other statutes Congress has not only required that corporations be created in the United States but has required that certain percentages of voting stock be owned by Americans or that a certain per-

centage of the seats on the board of directors be held by Americans. *See, e.g.,* provisions of the Federal Aviation Act of 1958, 49 U.S.C. § 1301(16) (1982); Communications Act of 1934, 47 U.S.C. § 310(b)(3)–(4) (1982).

goods bearing an American company's trademark without the company's consent. If, as the Customs Service now contends, the Act does not bar the importation of goods bearing a genuine trademark identical to an American trademark where the American and foreign trademark owners are the same company, or where the American trademark owner has authorized the use of the trademark, then the 1929 Senate passed an amendment that would have been wholly ineffectual and purposeless.[12]

Of course, because the statute was reenacted in identical form, the legislative history of the original enactment is of primary significance. Nevertheless, the events of 1929–30 reinforce our interpretation of the original legislative purpose. Although the attempt to amend the terms of Section 526 failed, no Member of Congress suggested that the amendment should be rejected because it could not achieve its intended purpose. Thus, it would seem that the entire body in 1930—those favoring and those opposing the amendment—believed that Section 526 applied to all situations literally within its terms.

*4. Contemporaneous Interpretations.* —The courts' reception of Section 526 supports our conclusion that it contains no implied exceptions. *Sturges v. Clark D. Pease, Inc.,* 48 F.2d 1035 (2d Cir.1931), held that Section 526 barred an individual's importation of a trademarked automobile for his personal use. The Second Circuit, referring to the Act as "drastic," rejected an argument that it only applied in situations similar to the facts of *Katzel.* Although Section 526 was enacted in response to *Katzel,* Judge Augustus N. Hand observed, "this fact does not settle the scope of the act." *Id.* at 1037.

For its part, the Customs Service gave no hint in its initial interpretations that it discerned implied limitations on the scope of Section 526. Its first set of regulations in 1923 simply referred to the Act without attempting to interpret it. Customs Regulations of 1923, Art. 476. The Customs Service's second set of regulations, promulgated after the 1930 reenactment of Section 526, merely stated: "Entry is prohibited of imported merchandise bearing a genuine trade-mark [identical to a properly recorded and registered American trademark] if compliance is had with all provisions of section 526 of the tariff act of 1930 ...." Customs Regulations of 1931, Art. 518(a).

In light of the language of the statute, its legislative history and purpose, and the contemporaneous constructions placed upon it, we conclude that Section 526 simply cannot be limited in the manner that the Customs Service has attempted. *See Vivitar,* 761 F.2d at 1561–65. Because Congress' intent on the issue at hand is apparent, we must give effect to that intent irrespective of current administrative interpretations. *Chevron,* 467 U.S. at 842–43 & n. 9, 104 S.Ct. 2781–82 & n. 9. In Section 526, Congress defined the relevant statutory terms with precision and did not delegate authority, explicitly or implicitly, to the Customs Service to adjust the scope of the statute in response to its perceptions of changing economic circumstances. What the statute meant in 1922 and in 1930 is what it means today.

B. *Subsequent Legislative and Administrative History*

■ The appellees maintain that the Customs regulations are supported by developments in the half-century since the passage

12. Thus, the appellees can obtain no solace from the statement of Senator Reed during the floor debate on the 1930 reenactment:

> At the present time the tariff laws forbid the importation of an article bearing a trademark registered in America unless the owner of that trade-mark consents in writing to that importation. Obviously the purpose of that provision is to protect the American owner of the trade-mark against importations of arti-

cles which have been stamped with his mark without his consent.

71 Cong.Rec. 3873 (1929). Because Senator Reed was a *proponent* of the effort to strip American trademark owners of the privilege of consenting to imports, logically the phrase "without his consent" in his remarks modifies "importations" rather than "stamped with his mark."

of Section 526. First, they contend that the regulations embody a reasonable, long-standing administrative interpretation of the statute; second, they suggest that Congress has manifested its "acquiescence" in that interpretation. We have already explained that the first argument must fail because deference to an agency's construction is inappropriate when congressional intent is clear; alternatively, we conclude that even if the Customs Service properly enjoys some role in construing the scope of Section 526, the regulations at issue do not in fact constitute a "sufficiently reasonable" interpretation of the statute. *Federal Election Comm'n*, 454 U.S. at 39, 102 S.Ct. at 46. *See infra* p. 916. We also reject the appellees' argument that Congress has somehow ratified the Customs Service's interpretation through its silence. *See infra* pp. 916–917.

*1. Developments in the 1930s and 1940s.*—Neither the 1923 nor the 1931 regulations had recognized any exceptions to the broad mandate of Section 526. Each contained separate articles enforcing the prohibition of Section 27 of the Trade-Mark Act of 1905 (the predecessor to Section 42 of the Lanham Act) against the entry of goods bearing trademarks that "copy or simulate" registered trademarks. *See* Customs Regulations of 1923, Art. 475; Customs Regulations of 1931, Art. 517(b). In 1936, however, the Customs Service unveiled a new approach. Article 518 of the 1931 regulations, which had dealt solely with Section 526, was now amended to correspond to the language of Section 27. The new Article 518 provided, *inter alia*, that foreign goods bearing a genuine trademark identical to an American trademark "shall be deemed for the purposes of these regulations to copy or simulate such protected trade-mark," T.D. 48,537 (1936); [13] however, it then exempted from this prohi-

bition articles bearing foreign trademarks owned "by the same person, partnership, association, or corporation" as the American trademark in question. *Id.* The Customs Service regulations offered no explanation for this change, and it is doubtful that amended Article 518 even purported to interpret Section 526 as well as Section 27.[14]

Certainly the United States Tariff Commission (now the International Trade Commission), another agency dealing with trade matters, did not think so. In 1944, when Congress held hearings on legislation that eventually became the Lanham Trade-Mark Act of 1946, it considered a memorandum submitted by that agency suggesting that Article 518 of the 1936 regulations, in view of its "copy or simulate" language, implemented Section 27 *but not* Section 526. Hearings Before a Subcomm. of the Comm. on Patents on H.R. 82, United States Senate, 78th Cong., 2d Sess. 86–87 (1944). The Commission justified this interpretation of Section 27 on the grounds that an enterprise could not "copy or simulate" its own trademark. *Id.* at 87. On the other hand, the Commission maintained, "Section 526 of the tariff act *does* apply to the merchandise of the trade-mark owner which bears his trade-mark if the merchandise was produced abroad and if the trade-mark owner is a citizen of the United States." *Id.* (emphasis added). After having been informed of the relationship between the two statutes and the prevailing administrative practice, Congress left Section 526 untouched and reconstituted Section 27 in identical form as Section 42 of the Lanham Act.

*2. Developments in the 1950s.*—Events of the 1950s reveal the Customs Service's profound confusion about the scope of Section 526 and its relationship to Section 42. On the one hand, in a 1951 private letter, the Commissioner of Customs set forth the

13. Amended Article 518 also contained a marginal reference to *A. Bourjois & Co. v. Aldridge,* 263 U.S. 675, 44 S.Ct. 4, 68 L.Ed. 501 (1923), which, it will be recalled, had held that Section 27 barred grey-market imports under circumstances similar to those present in *Katzel. See supra* note 10.

14. However, although Article 518 of the 1936 regulations did not expressly rely upon Section 526 as statutory authority, the Customs Service's 1943 recodification of its regulations did add a marginal citation to Section 526. *See* 19 C.F.R. § 11.14(b) (1943).

agency's view that Section 526 did not bar importation of the trademarked article of a foreign subsidiary of an American trademark owner. Letter from Frank Dow, Commissioner of Customs, to Sen. Paul H. Douglas, March 23, 1951 (Joint Appendix (J.A.) at 350). In 1953, Customs had the opportunity to codify this view when it amended the applicable regulation (now renumbered as Section 11.14) to provide that a genuine foreign trademark will not be deemed to copy or simulate an identical American trademark if both are owned by the same company *or* related companies. 19 C.F.R. § 11.14 (1953). But the amended regulation actually *deleted* a reference to Section 526 as statutory authority. And, to confound matters further, in 1958 the Solicitor General of the United States informed the Supreme Court that the Customs Service regarded Section 526 as a bar to importation of grey-market goods even in the related-company context. The Government had brought an antitrust action against American affiliates of foreign enterprises who had used Section 526 to preclude competition from grey-market imports. A district court had held that Section 526 did not protect such American affiliates and had found them guilty of antitrust violations. *United States v. Guerlain, Inc.*, 155 F.Supp. 77 (S.D.N.Y.1957). On direct appeal to the Supreme Court, the Solicitor General informed the Court that the United States wished to abandon the suit, noting the existence of intragovernmental conflict over the interpretation of Section 526 and suggesting that new legislation would be introduced to settle the controversy. Appellee's Motion to Vacate at 7, *Guerlain, Inc. v. United States*, 358 U.S. 915, 79 S.Ct. 285, 3 L.Ed.2d 236 (1958). According to the Solicitor General, the Justice Department's Antitrust Division considered Section 526 unavailable to American subsidiaries of foreign trademark owners, while Customs regarded itself as "legally constrained" to enforce Section 526 literally. *Id.* The Supreme Court accordingly vacated the lower court's judgment. *Guerlain*, 358 U.S. at 915, 79 S.Ct. at 285.

During the 1950s, Congress also reconsidered Section 526. In 1954, a bill was introduced in Congress that would have made the protections of Section 526 unavailable to an American trademark owner affiliated with the owner of an identical foreign trademark—in other words, a bill that closely parallels the Customs regulations at issue here. H.R. 9476, 83d Cong., 2d Sess. (1954). That bill, however, was defeated. In 1959, after the Supreme Court vacated the *Guerlain* judgment at the Solicitor General's request, another bill was introduced that would have repealed Section 526 altogether. H.R. 7234, 86th Cong., 1st Sess. (1959). But Congress rejected that proposal too.

In the aftermath of the *Guerlain* imbroglio, the Customs Service amended its regulations to delete the "related company" exception (while retaining the "same company" exception) and to add a citation to Section 526 as statutory authority for the regulations. *See* 19 C.F.R. § 11.14 (1959). There is some evidence, however, that the Customs Service privately continued to regard related companies as outside the scope of Section 526's protection. *See* Letter from D.H. Flynn, Deputy Commissioner of Customs, to Walter A. Slowinski, Esq., June 27, 1962 (J.A. at 355); Atwood, *Import Restrictions on Trademarked Merchandise—The Role of the United States Bureau of Customs*, 59 Trade-Mark Rep. 301, 310 (1969).

*3. Developments in the 1970s.*—The regulations were adopted in their current form in 1972. These regulations, we have noted, deny the protections of Section 526 to an American trademark owner when that company or an affiliate owns the foreign trademark or when it has authorized the use of the trademark. 19 C.F.R. § 133.21(c)(1)–(3). At no risk of overstatement, however, we observe that the Customs Service has not carefully explained exactly what purpose the regulations serve. The Federal Register notice accompanying the 1972 regulations, 37 Fed.Reg. 20,677 (1972), offers no insight into the agency's reasoning. From the scattered evidence the parties have cited to us, it

appears that the regulations might be regarded as resting in part on a reading of the legislative history of Section 526, *see* Letter from Walker B. Comegys, Acting Assistant Attorney General, Antitrust Division, to Miles J. Ambrose, Commissioner of Customs, April 19, 1971 (J.A. at 343), and in part on an accommodation of Section 526 with the policy of the antitrust laws. *See id.; see also* Letter from Treasury Secretary Donald T. Regan to Senator Dennis DeConcini, December 23, 1983 (J.A. at 319) (stating that the regulations are based on the *Guerlain* case). But prevailing antitrust doctrine has changed significantly since the *Guerlain* era. Perhaps because it is now recognized that domestic vertical restraints such as territorial market divisions may in fact have procompetitive effects, *see, e.g., Continental T.V., Inc. v. G.T.E. Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), the Government apparently no longer emphasizes the antitrust aspects of its interpretation of Section 526.[15] In fact, in a recent case the Justice Department—joined, significantly, by the Customs Service—filed an amicus brief arguing that Section 526 raised no antitrust concerns and *ought to be enforced according to its express terms. See* Brief of United States as Amicus Curiae, *Bell & Howell: Mamiya Co. v. Masel Supply Co.,* 719 F.2d 42 (2d Cir.1983). That amicus brief, seemingly flatly at odds with the Customs regulations under challenge here, represents yet another curious turn in the sixty years of Customs' administration of Section 526.

In 1978, a congressional committee report reviewing the statute took notice of Customs' interpretation. In the Customs Procedural Reform and Simplification Act of 1978, Pub.L. No. 95–410, 92 Stat. 888, Congress created an exception from the broad ban of Section 526 for goods brought into the country by individuals for their personal use, 19 U.S.C. § 1526(d) (1982); thus, after almost fifty years, Congress reversed the rule of *Sturges v. Clark D.*

*Pease, Inc.,* 48 F.2d 1035 (2d Cir.1931), *discussed supra* at p. 22. The House report accompanying this legislation stated:

> [Section 526] has been consistently interpreted by the United States Customs Service for the past 20 years as excluding from protection foreign-produced merchandise bearing a genuine trademark created, owned and registered by a citizen of the United States if the foreign producer has been authorized by the American trademark owners to produce and sell abroad goods bearing the recorded trademark.

H.R.Rep. No. 621, 95th Cong., 1st Sess. 27 (1977). Neither the Senate report, *see* S.Rep. No. 778, 95th Cong., 2d Sess. 33 (1978), U.S.Code Cong. & Admin.News 1978, p. 2211, nor the conference report, *see* H.R.Rep. No. 1517, 95th Cong., 2d Sess. 16 (1978), U.S.Code Cong. & Admin.News 1978, p. 2249, contained any similar reference to administrative practice.

&ast; &ast; &ast; &ast; &ast; &ast;

From this review, we find that the Customs Service's interpretation of Section 526 does not display the necessary "thoroughness, validity, and consistency" to merit judicial acceptance. *Federal Election Comm'n,* 454 U.S. at 37, 102 S.Ct. at 45. The Customs Service's interpretation under review here was not adopted contemporaneously with the statute, *see Zenith Radio Corp. v. United States,* 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978); moreover, the first set of Customs regulations announcing this policy appeared to implement *another* statute, then-Section 27 of the Trade-Mark Act of 1905, rather than Section 526. Nor has the Customs Service's interpretation since that time been supported by anything more than poorly articulated and vacillating reasoning. As our analysis shows, *see supra* Part II.A.2., the legislative history of Section 526 provides little if any support for its interpretation. At least since the 1950s, Customs'

---

**15.** We wish particularly to emphasize, however, that we express no view as to how antitrust analysis bearing on domestic vertical arrangements applies to the extraterritorial arrangements present in this case.

interpretation has been driven in large part by a perceived need to obviate the antitrust problems raised by a multinational corporation's use of an American subsidiary to preclude competition in the distribution of its trademarked product. But even if the Customs Service possessed the authority to infuse antitrust concerns into Section 526 —a dubious proposition at best, *see Osawa & Co. v. B & H Photo,* 589 F.Supp. 1163, 1177–78 (S.D.N.Y.1984)—the Service (together with the Justice Department) has not been remotely consistent in its exercise of that authority. We conclude that the Customs regulations cannot be upheld as a reasonable construction by the Customs Service of a statute it is charged with enforcing. *See Vivitar,* 761 F.2d at 1565–68.

We also reject the district court's view that this history reveals "a pattern of legislative acquiescence ... indicat[ing] acceptance by the Congress of the Customs Service's interpretation of section 526 ...." *Coalition to Preserve the Integrity of American Trademarks v. United States,* 598 F.Supp. 844, 851 (D.D.C.1984). In reaching this conclusion, we think that the district court departed from sound principles of statutory construction. To begin with, "unsuccessful attempts at legislation are not the best of guides to legislative intent." *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 382 n. 11, 89 S.Ct. 1794, 1802 n. 11, 23 L.Ed.2d 371 (1969) (citations omitted). Indeed, the unsuccessful efforts in 1954 and 1959 to repeal or modify Section 526, if anything, would suggest that Congress *rejected* a narrow view of its scope. Nor can approval of the Customs Service's interpretation of Section 526 be inferred more generally from Congress' failure to correct that interpretation. Since the Framers of our Constitution deliberately made the passage of legislation difficult—more difficult, for instance, than in parliamentary democracies—Congress simply cannot be obliged affirmatively to correct subsequent administrative interpretations inconsistent with original legislative intent; that is the responsibility of the courts. *See Vivitar,* 761 F.2d at 1568

("Legislation by total silence is too tenuous a theory to merit extended discussion.").

The circumstances surrounding the 1978 amendment also fail to support a case of congressional "ratification" of the Customs Service's interpretation of Section 526. In 1978, Congress simply added an amendment to the statute; thus, the proposition that Congress may be presumed to have adopted well-known administrative interpretations of a statute when it reenacts that statute without change, *see Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 382 n. 66, 102 S.Ct. 1825, 1841 n. 66, 72 L.Ed.2d 182 (1982), is inapplicable to this case. Congress reconsidered and addressed only the narrow issue of tourists returning to the country with trademarked goods intended for their personal use. That Congress deemed it necessary to amend the statute to exempt such cases from the statutory ban, in fact, suggests that it rejected the existence of implied limitations on the scope of Section 526. One casual statement in a committee report of one chamber, moreover, simply does not demonstrate Congress' "prolonged and acute awareness" of the Customs Service's interpretation, much less its "approval" and adoption of that interpretation. *See Bob Jones University v. United States,* 461 U.S. 574, 601, 103 S.Ct. 2017, 2033, 76 L.Ed.2d 157 (1983).

The intervenors argue with great vigor that Section 526, as we interpret it, would deprive American consumers of the benefit of imports at prices lower than those maintained by foreign producers through exclusive distribution by their American subsidiaries. That may well be so. They further contend that other nations, particularly our trading partners and competitors, do not permit American producers to maintain prices in their countries in this fashion, and that Section 526 in today's international market constitutes a sort of economic unilateral disarmament. That may also be so. Moreover, it is certainly true that economic and trading conditions have changed a good deal since 1922, and it may now be possible for foreign producers with an exclusive distributorship in the United States

to maintain artificially high prices on desirable imports in a manner quite unforeseen sixty years ago. All of these arguments are properly addressed to Congress; it is not open to the Customs Service, still less the Judiciary, to modify the law to take into account these considerations.

## C. *Enforcement Discretion*

Although it agreed that the Customs regulations do not represent a reasonable interpretation of Section 526, the Federal Circuit in *Vivitar* concluded that the Customs regulations can be upheld "as a reasonable exercise of administratively initiated enforcement." 761 F.2d at 1571. In its view, the Customs Service's policy of admitting certain categories of grey-market goods could be analogized to an agency's traditional prerogative of deciding when and how to enforce the statute it administers. We must reject this conclusion, however, for what seems to us a compelling reason: the Customs Service has never purported to justify these regulations as an exercise of enforcement discretion. *See SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). From the start, the Customs Service has regarded the regulations as its interpretation of what the law requires rather than as a decision not to prosecute to the letter of the law. *Cf. United Auto. Aerospace & Agr. Implement Workers v. Brock,* 783 F.2d 237, 245–46 & n. 15 (D.C.Cir.1986) (contrasting interpretation of law from exercise of enforcement discretion). Indeed, the Customs Service has historically enforced what it regards to be the law so relentlessly that it required an amendment to the statute to permit tourists to bring items intended for personal use back into the country with them. *See* 19 U.S.C. § 1526(d) (1982). Thus, this case simply does not raise the question of whether the Customs Service could refrain from excluding certain grey-market goods as an exercise of enforcement discretion.[16]

## III. REMEDY

We turn to the remedy. The appellants have requested that the Customs Service be enjoined from enforcing the present regulations and ordered, in effect, to enforce the statute to its fullest. We think, however, that injunctive relief is inappropriate at this juncture of the controversy. The appellants have levelled a facial challenge to the validity of the regulations; the relief they seek is not an order compelling the Customs Service to exclude specific goods, but rather a broad decree that would entail continuing supervision by the courts. We must decline the invitation. Although the appellants are entitled to declaratory relief —"an alternative to the strong medicine of the injunction," *Steffel v. Thompson,* 415 U.S. 452, 466, 94 S.Ct. 1209, 1219, 39 L.Ed.2d 505 (1974)—their request for injunctive relief should be denied.

For the foregoing reasons, the judgment of the district court is *reversed* and the case is *remanded* to the district court with instructions to issue a declaratory judgment that the Customs regulations in question, 19 C.F.R. § 133.21(c) (1)–(3), are contrary to Section 526 of the Tariff Act of 1930, 19 U.S.C. § 1526, and hence unlawful.

*So ordered.*

---

**16.** Thus, we are not obliged to decide whether Customs' adoption of a general policy of admitting certain categories of grey-market goods that are concededly barred by Section 526 would amount to "an abdication of its statutory responsibilities." *Heckler v. Chaney,* —— U.S. ——, 105 S.Ct. 1649, 1656 n. 4, 84 L.Ed.2d 714 (1985) (citing *Adams v. Richardson,* 480 F.2d 1159 (D.C.Cir.1973) (en banc)).